351 F.2d 354
 UNITED STATES of America, Appellant,
v.
Noel Jean SOMMERS, Linda Gay Sommers, a Minor, Cheryl Kay
Sommers, a Minor, and Daniel Scott Sommers, a
Minor, Appellees.
UNITED STATES of America, Appellant,
v.
Naida M. WOODS, Naida M. Ferris, Charles Robert Woods, a
Minor, and Marjorie J. Woods, a Minor, Appellees.
Noel Jean SOMMERS, Linda Gay Sommers, a Minor, Cheryl Kay
Sommers, a Minor, and Daniel Scott Sommers, a
Minor, Cross-Appellants,
v.
UNITED STATES of America, Cross-Appellee.
Naida M. WOODS, Naida M. Ferris, Charles Robert Woods, a
Minor, and Marjorie J. Woods, a Minor, Cross-Appellants,
v.
UNITED STATES of America, Cross-Appellee.
 Nos. 7806-7809.
 United States Court of Appeals Tenth Circuit.
 Sept. 30, 1965.
 
 David L. Rose, Atty., Dept. of Justice, Washington, D.C. (John W. Douglas, Asst. Atty. Gen., Washington, D.C., and Lawrence M. Henry, U.S. Atty., Denver, Colo., on the brief), for appellant and cross-appellee.
 Paul C. Brown, Denver, Colo. (Gerald A. Kay, Wayne D. Williams and Howard E. Erickson, Denver, Colo., on the brief), for appellees and cross-appellants.
 Before PICKETT, LEWIS and SETH, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 These two actions, brought against the United States under the Federal Tort Claims Act, 28 U.S.C. 1346(b), 2671 et seq., arose out of a mid-air collision between a United Air Lines, Inc. passenger plane and a United States Air Force Jet Fighter plane over Las Vegas, Nevada. The plaintiffs in the action are the widows and children of Arlin E. Sommers, Chief Officer (co-pilot), and Charles E. Woods, Flight Engineer, who were killed when the planes collided. The cases were consolidated for trial.
 
 
 2
 When the collision occurred, the United DC-7 was enroute from Los Angeles, California to New York City, with intermediate stops at Denver, Colorado, Kansas City, Missouri, and Washington, D.C. The fighter plane was engaged in a flight to train a student in instrument flying in the area of Nellis Air Field near Las Vegas, Nevada. In each action the United States denied that its agents and employees were negligent, and as an affirmative defense, alleged contributory negligence. The trial court found that the negligence of the employees and representatives of the United States was the proximate cause of the collision and that Sommers and Woods were free from any negligence. Judgment was entered in favor of the plaintiffs in the Sommers case for $219,800.00, and in the Woods case for $123,400.00. The United States appeals, contending only that the record establishes contributory negligence as a matter of law. In their cross-appeals the plaintiffs urge that the damages are inadequate.
 
 
 3
 There is very little conflict in the evidence. Most of the essential facts were stipulated to at pre-trial proceedings and became a part of the pre-trial order. The facts agreed upon disclose that at about 7:30 on the morning of April 21, 1958, a DC-7 propellor-driven passenger plane owned and operated by United, with 42 passengers aboard, left Los Angeles, California for New York City. The flight plan filed with the Civil Aeronautics Administration (CAA) proposed the use of Civil Airway Victor 8[1] from Ontario, California to Denver, Colorado, at a cruising altitude of 21,000 feet above sea leve. The flight crew consisted of Captain Duane M. Ward, Sommers, Woods, and two stewardesses. At 8:11 A.M. the DC-7 reported that it was over Daggett, California and estimated its arrival over Las Vegas at 8:30 A.M. At 8:30 plus 20 seconds the last message from the DC-7 reported the mid-air collision with the Jet fighter. All occupants of the two planes were killed. It was stipulated that at the time of the collision the weather was clear with visibility about 35 miles, and that the DC-7 'was flying in all respects in compliance with the terms of the IFR (Instrument Flight Rules) clearance issued to it by Defendant's agency CAA-- straight and level at an altitude of approximately 21,000 feet, and within the confines of the civil airway known as 'Victor 8.' * * *'
 
 
 4
 Nellis Air Force Base is located in the vicinity of Las Vegas, Nevada. Prior to the arrival of the United plane in the area of Las Vegas an F-100F Super Sabre jet fighter airplane took off from the Nellis field on a training flight. Captain Coryell, as instructor and observer pilot, was in the front seat, and First Lieutenant Moran, a student pilot, in the rear seat. Lt. Moran was being instructed in the operation of the fighter by instruments only. He was under a hood which covered the cockpit and was unable to see outside. The instructor had two-way microphone communication with the student, and his duties were to instruct the pilot in the rear seat, monitor his performance and maintain a lookout for other aircraft. The F-100F had dual pilot control and the instructor could take over the operation and control of the plane at any time. The training flight involved a descent and approach to the Nellis Base under simulated instrument flying conditions from an altitude of more than 21,000 feet. The descent was to be made in a 'teardrop pattern', with the Las Vegas commercial radio station KRAM as the navigational 'fix' point for initiating and concluding the training flight which was referred to as the 'KRAM procedure.'[2] The prescribed angle of descent when executing the maneuver was approximately five degrees.
 
 
 5
 At 8:23 A.M. the fighter plane notified the Nellis control tower that it was in-bound on the KRAM procedure, and asked for an altitude assignment to commence its teardrop penetration. It was assigned an altitude of 28,000 feet. At 8:27 it reported that it was over the KRAM station, and requested a penetration clearance, which was promptly given. At 8:28 A.M. it reported that it was leaving the 28,000 foot level to begin the penetration. This was the last report from the fighter plane. Approximately two minutes later the United DC-7 reported the mid-air collision. In the stipulation of facts, paragraph 16 recited: 'Defendant's F-100F was executing a practice KRAM procedure at the time of the collision.' It was stipulated in paragraph 33: 'The Government's F-100F plane was descending as it approached UAL's DC-7 and at the time of impact.' In paragraph 34 it was stipulated: 'As the two planes approached each other, their courses were converging.' There were two eye witnesses to the collision, one of whom testified that about two seconds before the collision the wings of the fighter plane 'dipped.' The other testified that just before the impact the F-100F 'swooped down' onto the DC-7. There was evidence that the F-100F crossed the nose of the DC-7 from left to right and its right wing collided with the DC-7's right wing, and that at the time of the impact the F-100F was in a 90 degree bank to the left at an angle of descent of approximately 17 degrees with its speed brakes retracted. There was also evidence that the First Officer Sommers, and the Flight Engineer Woods, from their normal positions in the cockpit of the DC-7, had a lateral visibility range ahead of approximately 120 degrees, and a vertical visibility range of approximately 20 degrees, 10 degrees up and 10 degrees down.
 
 
 6
 In its findings, the trial court stated that paragraphs 16, 33 and 34 of the stipulated facts would not be adopted as findings. Instead, the court found as follows: 'The Government's F-100F was attempting to execute a practice KRAM procedure at the time of the collision; that at the time of impact and immediately prior thereto the F-100F was descending, and that immediately prior to the collision the courses of the two planes were converging.'
 
 
 7
 The United States argues that under the stipulated facts the F-100F was converging on the DC-7 head-on under the KRAM procedure at a 5 degree angle of descent, and the members of the crew were negligent as a matter of law in not observing and avoiding it. With this contention we do not agree.
 
 
 8
 Generally, facts agreed to by the parties to litigation and established by pretrial order, are to be considered facts on the trial, without further evidence, and may be modified at the trial only to prevent manifest injustice. The trial court may not disregard the facts stipulated to by the parties or require evidence to support them. Rule 16, F.R.Civ.P.; Laird v. Air Carrier Engine Service, 5 Cir., 263 F.2d 948; Taylor v. Reo Motors, Inc., 16 Cir., 275 F.2d 699, 704; Globe Cereal Mills v. Scrivener, 10 Cir., 240 F.2d 330; Berger v. Brannan, 10 Cir., 172 F.2d 241, cert. denied 337 U.S. 941, 69 S.Ct. 1519, 93 L.Ed. 1746. This case, however, was not submitted to the court solely upon the stipulation of the parties, and it was not tried upon theory that the fighter plane was descending according to the KRAM procedure at the time of the collision. On the question of liability, there was admitted in evidence the transcript of testimony and exhibits of two earlier cases involving the same accident, along with the testimony of live witnesses, all on the subject matter as that contained in the stipulation.[3] There was evidence introduced for the purpose of showing that the fighter plane was not descending as contemplated by the KRAM procedure. The court was required to make independent findings based on the stipulation, the records in the other cases, and the live testimony. In the most part, the court adopted the language of the stipulation in its findings. The three findings in dispute here are in the language of the court, based upon the stipulation which was in general language, together with the transcript of evidence in the other cases and the testimony of live witnesses, which dealt with the question of liability in detail. These findings are not inconsistent with the general statements of the stipulation and were not so considered during the trial. They are not in violation of Rule 16 or the pre-trial order.
 
 
 9
 The stipulation that the fighter plane was executing a practice KRAM procedure at the time of the collision does not admit that it was being performed in the manner which the procedure provided. The only difference in the court's finding and the stipulated facts is the use of the words 'attempting to execute' the KRAM procedure, rather than the word 'executing' it. The only change in paragraphs 33 and 34 of the stipulation is that the Court's findings specifically limit the course of the F-100F to the time immediately before the collision. These findings could have been made without any reference to the stipulation, and would not have been in conflict therewith. As stated by the trial court, 'There is no competent evidence from which the course of the F-100F can be determined, either horizontally or vertically, from the time it reported its departure from 28,000 feet until immediately before the collision.' The obvious intent of the stipulation was to show the purpose of the F-100F flight, not how that purpose was being executed. If there was evidence from which it could be inferred that the F-100F was coverging on the DC-7 within view of its Captain Sommers, and Woods, there was also evidence to the contrary. The trial court resolved this conflict in favor of the plaintiffs. This finding is not clearly erroneous and will not be disturbed on appeal. Rule 52, F.R.Civ.P.; Guzman v. Pickirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205; State Farm Mutual v. Lehman, 10 Cir., 334 F.2d 437; Weaver v. United States, 10 Cir., 334 F.2d 319; Wunderlich Contracting Co. v. United States ex rel. Reischel & Cottrell, 10 Cir., 240 F.2d 201, cert. denied 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859.
 
 
 10
 The United States, to establish negligence on the part of the DC-7 crew as a matter of law, relies upon United Air Lines, Inc. v. Wiener, 9 Cir.,335 F.2d 379, cert. dismissed United Air Lines, Inc. v. United States, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed. 549, where the court affirmed judgments against both United Air Lines, Inc. and the United States in a number of actions brought by the survivors of the passengers in the DC-7, wherein a jury found both defendants negligent.[4] On appeal, the court there concluded that the evidence 'at least creates a conflict with the factual premises upon which rests United's conclusion that its crew could not have seen the jet until immediately prior to the collision. This conflict was resolved against United by the triers of fact, and we are unable to say that clear error was committed thereby.' 335 F.2d at 389. However, in resolving the question of United's negligence upon a virtually identical record in the case at bar, the trial court found differently than did the jury in the California cases. We cannot say that the finding is clearly erroneous.
 
 
 11
 The plaintiffs, in their cross-appeals, insist that the awards made by the trial court are inadequate and result from wrongful mathematical calculations and deductions. We are satisfied that considering the record as a whole, the judgments were not only adequate, but generous.
 
 
 12
 The parties agree that the recovery in each case is to be determined by Nevada law. Nevada Revised Statutes, 1958, 41.090, provides that actions for wrongful death may be maintained by the heirs of the deceased and that the court or jury may give 'such damages, pecuniary and exemplary, as shall be deemed fair and just.'[5] At the time of his death, Sommers was 36 years of age, with a life expectancy of approximately 36 years. His wife was 33 years old, and his three children were 12, 8, and 6 years. The year preceding his death, Sommers' gross earnings were $11,205.93. The court found that in the ordinary course of events he would be promoted to Captain by 1963 and would earn $22,500 annually. Using this as a basis for his estimated future working years, and taking into consideration the necessary personal expenditures of the deceased in his employment and otherwise, together with estimated income tax withholdings, after adding comparatively small amounts for loss of personal services, the court concluded that during his working years Sommers would contribute for the use and benefit of the plaintiffs from his net earnings, approximately $11,500.00 per year. The court found that the sum of $219,800.00 would provide this income.[6]
 
 
 13
 At the time of his death, Woods was 43 years of age, with a life expectancy of less than 30 years. His wife was 41 years of age and his three children were 20, 18, and 15 years. At the time of his death, his gross earnings were $10,299.21 per year. The court made a general computation of the net earnings of Woods which would be available for the plaintiffs over the definite period of his life expectancy, including loss of benefits from a pension plan. The amount necessary to provide the income so computed was found to be $123,400.00.[7] No allowance was made for loss of future companionship, society and comfort to any of the plaintiffs. Ordinarily, the award of damages in wrongful death cases is within the discretion of the trial Judge. Such awards are not subject to accurate mathematical calculations. They will be sustained on appeal unless so grossly excessive or inadequate as to constitute clear error. Lane v. Gorman, 10 Cir., 347 F.2d 332, and cases cited therein; Leavitt v. Scott, 10 Cir., 338 F.2d 749. The amount which survivors may receive is to be determined from income which it is estimated would have been available to them from prospective future earnings of the deceased had he lived. No doubt the income available to the survivors would be after income taxes had been withheld. However, there is little agreement to be found in the reported cases regarding the application of possible income tax liability to damage awards based upon the prospective earnings of a deceased or injured person. See, for example, Montellier v. United States, 2 Cir., 315 F.2d 180; McWeeney v. New York, N.H. & H.R.R. Co., 2 Cir., 282 F.2d 34, cert. denied 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93; O'Connor v. United States, 2 Cir., 269 F.2d 578; Anno. 63 A.L.R.2d 1393. Undoubtedly situations may arise in which the failure to take into account income tax liability would produce an unconscionable result, and conversely a similar result could be obtained if too great a deduction were applied. When dealing with such an imprecise and speculative subject, the best that can be hoped for is reasonableness. It is a determination best left to the exercise of sound discretion of the trial Judge, whether with or without a jury. In this case it seems that the Court reached a fair and adequate result by using the best method it could devise to fit the situation. We cannot say that the result was anything but reasonable.
 
 
 14
 Appellants also question the omission of an additional element of damages from the Court's computation. However, under Nevada's death statute in force in 1958, damages for loss of future companionship, society and comfort of the deceased was not a proper element of damages. Wells, Inc. v. Shoemake,64 Nev. 57, 177 P.2d 451. See, also, Porter v. Funkhouser, 79 Nev. 273, 382 P.2d 216, which was decided after the statute was amended.
 
 
 15
 Affirmed.
 
 
 
 [1]
 Victor 8, a major trans-continental airway, was established on June 1, 1952, and includes the navigable airspace above all the area of the surface of the earth lying within five statute miles of each side of the center line as prescribed for Victor 8 Airway up to an elevation of 27,000 feet mean sea level. It extends from Long Beach, California to Washington, D.C., and passes over Ontario and Daggett, California, Las Vegas and Mormon Mesa, Nevada
 
 
 [2]
 The KRAM procedure, as found by the trial court, is described as: 'The KRAM procedure was designed by the command of the Nellis Air Force Base as a procedure to descend from an altitude of 20,000 feet or above to an altitude of 6,000 feet, using as a 'fix' for initiating and concluding the penetration a commercial broadcast radio station (KRAM) located within the lateral boundaries of Civil Airway Victor 8. The procedure prescribed that the Nellis jets, on approaching KRAM, get a clearance for the KRAM penetration from Nellis VFR Control, cross KRAM at 20,000 feet or above, descend on a magnetic track of 170 degrees at 300 knots indicated air speed (approximately the equivalent of 430 knots or 495 miles per hour true or actual air speed under the atmospheric conditions prevailing on the morning of April 21, 1958 at 21,000 feet) to an altitude of 11,000 feet within 16 nautical miles (18,425 statute miles) of KRAM. Upon reaching 11,000 feet on a magnetic track of 170 degrees, the procedure prescribed a right turn of 1 1/2 degrees per second and the bank of 30 degrees, and a crossing of the KRAM station at an altitude of 6,000 feet. During the descent it was prescribed that the speed brakes be extended. This procedure is commonly termed a 'teardrop penetration' and derives its name from the fact that the path of the plane executing the procedure, if drawn on the earth, would resemble the shape of a teardrop.'
 
 
 [3]
 Included in the pre-trial order were the following provisions:
 '1. The transcript of testimony, together with Exhibits or copies thereof and deposition transcripts upon the issue of liability taken in the trial of the cases of United Air Lines, Inc. v. United States, Civil 2043, United States District Court for the District of Delaware, and Janice Wiener, et al., vs. United States and United Air Lines, Inc., Civil 469-58-PH, (237 F.Supp. 90), United States District Court for the Southern District of California, may be used as evidence in these consolidated cases as though they were depositions noticed in these cases and subject to Rule 26 of the Federal Rules of Civil Procedure, and without further foundation or certification. Said materials shall be filed with the Court on or before June 1, 1963.' * * *
 '3. Each party may call such further live witnesses as it desires and shall, ten days prior to trial, advise the Court and opposing counsel in writing of the names, addresses and occupations of such witnesses, together with the subject matter of testimony to be elicited from such witness.'
 
 
 [4]
 In a large number of cases arising out of this collision, those in the California courts which were brought against the United States and United Air Lines, Inc., went to trial, and judgments were rendered against both defendants. These judgments were affirmed. United Air Lines, Inc. v. Wiener, 335 F.2d 379
 In the District of Delaware, United Air Lines, Inc., sued the United States to recover the value of its airplane. The court there held neither crew negligent for failure to see and avoid, but held the United States liable because of other negligence. The record indicates that the Delaware case was settled without appeal. By agreement of the parties, much of the record in this case was made in the trials of the previous cases.
 
 
 [5]
 In 1960, Nevada Revised Statute, 1958, 41.090, was amended to include 'damages for loss of probable future companionship, society and comfort' of the deceased
 
 
 [6]
 In its findings, the Court recapitulated these damages as follows:
 "Damages for being deprived of earnings for the period of
 April 21, 1958 to January 1, 1964 $ 64,600.00
 Damages for being deprived of earnings for the period of
 January 1, 1964 to March 27, 1982 148,300.00
 Damages for loss of personal services of Sommers from April
 21, 1958 to January 1, 1964 1,700.00
 Damages for loss of personal services of Sommers from
 January 1, 1964 to January 1, 1994 5,300.00 *
 -----------------
 Total $219,800.00"
* It is clear from the Court's finding that this figure should be
 $5,200.00, therefore the total is correct.
7 The Court's recapitulation of these damages was:
"Damages for being deprived of earnings for the period of
 April 21, 1958 to January 1, 1964 $ 47,600.00
 Damages for being deprived of earnings for the period of
 January 1, 1964 to October 1, 1974 54,500.00
 Damages for loss of personal services of Woods from April
 21, 1958 to January 1, 1964 3,400.00
 Damages for loss of personal services of Woods from January
 1, 1964 to January 1, 1987 8,900.00
 Damages for loss of benefits of pension plan 9,000.00
 ------------
 Total $123,400.00"