Robert E. DeWEESE, Plaintiff,

v.

UNITED STATES of America,
Defendant.

J'Ette Marie FRIZZELL and Alva
Jolyn Faull, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. MDL–88–1.
Civ. A. Nos. C–3097, C–3799.

United States District Court,
D. Colorado.

Aug. 5, 1976.

Kenneth N. Kripke, Denver, Colo., Lundy, Butler, Wilson & Hall by John L. Butler, Eldora, Iowa, Law Offices of Floyd A. Demanes by Joseph E. Russell, Burlingame, Cal., for plaintiffs.

Mark A. Dombroff, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION ON DAMAGES

WINNER, Judge.

After the first opinion which found liability in this case was filed, 419 F.Supp. 147, a trial was held to determine the amount of damages. I have delayed making the damage determination awaiting guidance from the United States Court of Appeals for the Tenth Circuit on two questions which have troubled me in these and in other cases. I anticipated receiving that guidance from the Court of Appeals in *Sanchez v. Denver & Rio Grande Western Railroad Company*, 538 F.2d 304. After that case was briefed and set for oral argument, it was partially remanded for me to hear a motion for new trial based on allegedly newly discovered evidence. I did so and denied the motion. This postponed the argument of *Sanchez* before the Court of Appeals, and it was not decided until July 22, 1976. To me, the case clearly decides one of the troublesome questions; i. e., the question of whether I should consider gross or "take-home" pay in awarding damages, but we still have no Tenth Circuit opinion which passes squarely on the "inflation factor" question which bothers me so much.

In *Sanchez*, the Court said:

"In the present posture of the case the defendant does not complain of the many assumptions made by the expert witness in arriving at his conclusions and the plaintiff cannot so complain except as to the consideration of tax impact. The many complexities noted by Judge Friendly's opinion in *McWeeney v. New York, N.H. and H. R.R.*, 2 Cir., 282 F.2d 34, *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93, and further complicated and confounded by a multitude of subsequent cases within the circuits, although argued and presented to us in briefs, are not here pertinent. The single issue is whether the court erred in insisting that

the tax impact be considered by the expert, not the broad question of the acceptability of the expert's total approach. "The trial court premised its ruling and its firmness, and properly so, on *United States v. Sommers*, 10 Cir., 351 F.2d 354, in which this court approved consideration of future tax impact in a wrongful death case stating:

" 'Undoubtedly situations may arise in which the failure to take into account income tax liability would produce an unconscionable result, and conversely a similar result could be obtained if too great a deduction were applied. When dealing with such an imprecise and speculative subject the best that can be hoped for is reasonableness. It is a determination best left to the exercise of sound discretion of the trial Judge, whether with or without a jury.' "

■ In accordance with my own convictions and with my understanding of *Sanchez*, I do take income taxes into account and I award damages in these cases on the bases of "take-home" pay. It is argued vigorously in the briefs that gross pay should be the base, but I just simply can't buy that argument. As I understand damage theory, the award for lost income should be for the income the plaintiffs have lost, and what they have lost is the amount left over after the government takes its inevitable bite. I think that an award of gross pay would be a windfall to the plaintiffs, although I recognize that where, as in *Sanchez*, the suit is against the employer, the employer is given a break because the employer would have been paying the gross amount to Sanchez and his "partner", the IRS. In this sense, under the circumstances of *Sanchez*, the employer benefits from computing damages on a "take-home" pay basis, but even the IRS hasn't figured out how to intervene to claim in a wrongful death or personal injury suit that it should be compensated for the loss of future withholding taxes. Here, though, the employer is not the tort feasor, and the reasons for using "take-home" pay are even more compelling than they were in *Sanchez*.

■ The claim for an inflation factor is a claim for something which is to me too speculative to figure out. I know that in *McWeeney v. New York, N.H. & H. Railroad Company*, (1960) 2 Cir., 282 F.2d 34, [mentioned by Judge Lewis in *Sanchez*] Judge Friendly said:

"Though some courts have sanctioned instructions permitting the jury to take into account inflation between the injury and the trial, *there is little or no authority in favor of charging the jury to take future inflation into account*, see 2 Harper and James, The Law of Torts, § 25.11 (1956). Yet there are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor. The effect of inflation of 1% a year over McWeeney's 29-year expectancy at trial would go a long way toward offsetting any excess in the verdict due to failure to deduct income tax."

There will probably be inflation, but how much and at what rate are matters too elusive for me to predict or to calculate in awarding damages which are uncertain to start with. In this case, the "econometrist's" calculations were before me, and I found them to be totally unconvincing. After long study, I have concluded that such speculative predictions should not be presented to a jury. I am unconvinced that anyone can foretell economic conditions 45 years down the road, and to permit an alleged expert to do so is to permit testimony which is nothing but crystal ball gazing. It is to be remembered that 45 years ago we were at the bottom of the Great Depression. In 1931, a transcontinental telephone call cost about $20, and for that same $20 one could mail 1,000 letters. Today, the call can be made for less than $1.50, but only 155 letters can be mailed for $20.00. In other words, some costs go up and some go down,

and I hope that the fact that Ma Bell is investor owned and the Postal Service is government owned is not the only reason telephone rates have gone down and postal rates have gone up. Forty-five years ago, one of the largest of the building trades was that of the plasterers. Today plasterers are almost a curiosity. The "econometrist's" predictions assume that there will be a continuing and a growing demand for ever more high priced airline pilots. With the rapid development of automation, who is to say that by the year 2021 commercial airline pilots will not be an occupation of the past. During the last 45 years coal miners have found out a lot about automation just as have the members of many other trades.

I fully agree with Judge Lumbard's comments in dissent in *McWeeney*:

"We can only deal in today's dollar. On any other basis any trial would soon be out of hand with only the sky as the limit. Defendants too must live with inflation, be they railroads or individuals; indeed railroads seem to have even more difficulty with inflation than do individuals. A plaintiff receiving a large amount will invest the money in all likelihood in such a manner that he will have some protection against both inflation and deflation."

I grant that if an investor follows the "prudent man rule", full protection against inflation will not be accomplished, but there are so many imponderables in fixing damages in wrongful death and personal injury actions that I think it would be a serious mistake to venture into the wild blue yonder of permitting "econometrists'" testimonial guesstimates of inflation. Any trial judge who has listened with amazement to a forecast by an "econometrist" knows how right Judge Lumbard was when he said that testimony on future inflation would mean that a "trial would soon be out of hand with only the sky as the limit." Since I let the evidence in during the trial of these cases [which I shall not do in the future] when I come to the award of damages I shall mention just how high "econometrists" can soar when turned loose on

forecasting inflation. I do this to demonstrate the morass in which trials would wind up in any case involving future income or profits.

I think that much of the uncertainty in the cases has come from confusing inflation and reasonable job progression to be anticipated by a particular young employee. This is essentially the conclusion reached by the Third Circuit [485 F.2d 132] and by Judge Herman in *Hoffman v. Sterling Drug, Inc.*, (1974) D.C.M.D.Pa., 374 F.Supp. 850, on remand after the Third Circuit's decision in the same case:

"As difficult as it might be to separate (in the actuarial sense) the earnings increase factor of a particular plaintiff from future economic trends, separate they must be. Therefore, this court concludes that at the upcoming re-trial on the merits, the plaintiff will be allowed to argue the earnings increase factor to the jury only insofar as the evidence applies to the plaintiff Clinton Hoffman. *This court will not allow into evidence any testimony regarding future inflation or deflation, regardless of the foundation laid for it.*"

Plaintiffs argue that because only present value of a future income stream can be awarded, inflation should be taken into account as an offset. This is not a first time for the argument, and I reject it as did the Sixth Circuit in *Sleeman v. Chesapeake and Ohio Railway Company*, (1969) 414 F.2d 305:

"The District Judge did, as appellant asserts, decide to award damages without reducing them to present worth. He did so because he held that inflationary trends would offset any present worth reduction. See *Gowdy v. United States*, 271 F.Supp. 733 (W.D.Mich.1967).

.    .    .    .    .

"This same case [*Chesapeake and Ohio Ry. v. Kelly*, 241 U.S. 485, 36 S.Ct. 630, 60 L.Ed. 1117] provides:

" '[I]n computing damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate

allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made up on the basis of their present value only.' *Chesapeake & Ohio Ry. v. Kelly, supra* at 491, 36 S.Ct. at 632. "To date *Chesapeake & Ohio Ry. v. Kelly* has not been amended or overruled, and it was error to fail to apply it to the computation of future earnings.

"As to the inflationary trend offset, this record provides no evidentiary basis for the decision of the District Judge. *Gowdy v. United States, supra,* in which the District Judge arrived at the same conclusion after hearing some economic testimony is not authority for the offset in this case, since it has been reversed on other grounds. *Gowdy v. United States,* 412 F.2d 525 (6th Cir. 1969). *Nor do we encourage the trial courts of our circuit to explore such speculative influences on future damages as inflation and deflation.*

"Of course, the nation's economic history since the 1930's would appear to make the use of present wages as the standard for loss of future earnings somewhat unfair to plaintiffs. But as to the future, the inflation versus deflation rages inconclusively at the highest policy levels of our government, in national electoral campaigns, in learned economic journals and is exemplified in the daily gyrations of the stock markets. The debate seems unlikely to be resolved satisfactorily in one personal injury trial. *And if testimonal* (sic) *resolution of this factor bearing on the future is attempted, the door is opened to similarly speculative and debatable offsets tending in other directions.* See *McWeeney v. New York, N.H. & H. R.R.,* 282 F.2d 34 (2d Cir. 1960).

"Harper & James accurately describes the past history of this debate and the present prevailing view:

" 'Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations, either way. If prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grappled with the problem they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure from some imaginary norm to which they think we shall rapidly return. *It is not at·all clear that courts would be willing to hear experts on the matter, or that they would get much real help if they did.* For the most part the problem—which is inevitably present in every case of future loss—is not analyzed and the present value of money is assumed to be the proper basis.' II F. Harper & F. James, The Law of Torts § 25.11 (1956). (Footnotes omitted.)"

I make no attempt to review all of the cases stewing about "the many complexities noted by Judge Friendly's opinion in *McWeeney v. New York, N.H. & H. R.R.,* 2 Cir., 382 F.2d 34, cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93, and further complicated and confounded by a multitude of subsequent cases within the circuits." *Sanchez v. Denver & Rio Grande Western Railroad Company, supra.* The divergent views create a quagmire, and, until the Tenth Circuit speaks definitively on the subject, all I can do is to use my best judgment. I think that inflationary trends and predictions espoused by "econometrists" testifying as advocates have no place in a lawsuit. The award of damages in a wrongful death or personal injury case is an approximation at best, and testimony confidently predicting economic conditions many years in the future is more likely to be wide of the mark than it is to approximate justice. Of course, the long range price trend has been on the upside historically, but

where it is going in the future is anyone's guess. Prices go up and prices go down. Taxes are the only thing that have always gone up, and with our national debt, they will continue to go up. I think that there is a better chance of a controlled economy than there is of accurately predicting inflation. I think that to permit "econometrists" to testify to long range inflation is to invite chaos and disaster.

With this expression of my thoughts about damage theory, I reach that which is required of me; the award of damages in two wrongful death cases [Frizzell and Faull] and one personal injury case [DeWeese]. Damages must be awarded in accordance with Colorado law, and Colorado has long followed the pecuniary loss rule in wrongful death cases. *Pierce v. Conners*, (1894) 20 Colo. 178, 37 P. 721. In a trial to the court, I must apply the principles required of a jury in fixing damages, and the approved Colorado Jury instructions say:

"You shall assess as damages, insofar as they have been established by the evidence, an amount which will fairly and justly compensate for the net pecuniary or financial loss. . . . The net pecuniary or financial benefit, if any, which the plaintiff might reasonably have expected to receive from decedent had he lived. In assessing such damages you should consider the age and health of the decedent, his habits of industry, his ability to earn money, his disposition to aid and assist the plaintiff, and the probable duration of the lives of both plaintiff and the deceased. . . ."

This is a fair statement of Colorado law, *Kogul v. Sonheim*, (1962) 150 Colo. 316, 372 P.2d 731; *Herbertson v. Russell*, (1962) 150 Colo. 110, 371 P.2d 422, and *Rigot v. Conda*, (1956) 134 Colo. 375, 304 P.2d 629, and in applying it, I find:

Floyd Wayne Frizzell left surviving him a widow who was 22 years of age and she gave birth to a daughter after Frizzell's death. Frizzell was 24 years of age at the time of his death, and he had a life expectancy of 46.4 years. Both Frizzell and his widow were in good health, and they were happily married.

James Leonard Faull left surviving him a widow who was 20 years of age. He was 25 years old at the time of his death, and his life expectancy was 45.5 years. He and his wife too were in good health and happily married. Both couples shared interests in similar activities, and both husbands helped around the home. As was noted in the earlier opinion in this case, both Frizzell and Faull were pilots for Metro Commuter Airlines, Inc. at the time of their death, and the evidence has established that both desired to become a pilot for a commercial airline sometime in the future, but the evidence to show that there was a reasonable probability that they would secure employment by a commercial airline is totally lacking.

Frizzell was in the Air Force as an Airman 2c, and after his discharge he received employment as an aircraft mechanic and took flying lessons. In 1968, he was employed as a pilot on non-scheduled flights in Texas, and, after a series of jobs, he was hired by Metro. He had a high school diploma, and had discussed attending college on a part time basis.

Faull was a high school graduate who attended two years of college. He received aviation training in the Army, and was a helicopter pilot in Korea and Viet Nam. Following his honorable discharge from the service, he obtained a commercial certificate with ratings in single-engine and multi-engine aircraft, and he held instrument ratings. To obtain flying time he worked for a company in Texas for which he piloted Cessna twin-engined aircraft. In March, 1969, he was employed by Metro and flew the Queen Aire which crashed.

Necessarily, then, with the ages of Frizzell and Faull taken into account, and with their brief employment history, determining their future earnings is difficult and the pecuniary loss of plaintiffs is even more uncertain. This is so, of course, because of the unclear employment future and because the unavoidable personal expenses of the two husbands have to be taken out before

net pecuniary loss of the widows can be determined.

Testifying for plaintiffs, the witness Stone made two projections for each of the deceased pilots. Projection "A" assumed that each would continue his employment by Metro, and Projection "B" guessed that each would be hired by a commercial airline after five years. Each projection assumed an average increase in pilot earnings on a *compounded* 6% basis, and also on a *compounded* 8% basis. The expert explained in his report:

"By applying these growth rates to each pilot's earnings level, I arrived at his expected earnings during the balance of his normal working life. That sum was then diminished by the estimated portion of such income which would have been consumed by the pilot for his own personal use. The resultant economic loss to his family was then discounted at 4% to arrive at its present value."

Illustrative of the heights to which experts can rise when turned loose with a pencil, a calculator and a set of financial tables are the figures this "econometrist" came up with under Projection "B" using the 8% inflation rate. To be sure that he erred on the "conservative side", the report stresses that fringe benefits, the value of personal services in the household and future inheritances are excluded. Being ultra conservative, he assumed pilot employment only to age 60. Under this "conservative approach", and with his free flying calculator, the future earnings, personal consumption, and pecuniary loss to plaintiffs were confidently predicted, and plaintiff's alleged losses were reduced to present value at the 4% rate. These are the eye-popping results:

| Growth rate | Future Earnings | Personal Consumption | Pecuniary Loss | Present Value |
|---|---|---|---|---|
| | | Floyd Wayne Frizzell | | |
| 8% | $3,744,000.00 | 1,098,186.00 | 2,646,000.00 | 1,206,013.00 |
| | | James Leonard Faull | | |
| 8% | $3,764,029.00 | 1,129,209.00 | 2,634,820.00 | 1,199,983.00 |

The "econometrist's" report noted that as of the time of their deaths, Mr. Faull was earning $9,000.00 and Mr. Frizzell was earning $7,680.00. He anticipated that both pilots would be raised to $13,200.00 per year within the year following their death, and then the growth rates took command. Projection "B" also guessed that at the end of five years, both would be hired by commercial airline.

I hope that this summary of the "econometrist's" report shows why I reject testimony on future inflation. Let's face it. Mr. Frizzell, who was earning $7,680.00 per year when he was killed, was 22 years of age. Assuming he had a life work expectancy of 38 years [to age 60], which was the assumption of the "econometrist", it is said that he will earn $3,744,000.00 over those 38 years.[1] This means that his *average* earnings to age 60 will be $98,526.00 per year. Over his work life expectancy [to age 60] he is going to spend an *average* of $28,894.00 on his *personal* needs. With a starting place of $7,680.00 in earnings and with straight line increases, to come up with these numbers he would earn $310,485.00 during his 60th year. If he worked to age 65, he would earn a tidy $456,205.00 during the last year he worked.[2] With $1,206,013.00 [the present value of the net pecuniary loss on the conservative estimate that the full work life will end at age 60] invested at 6%, and there are tax free municipals which pay 6%, the annual tax free income would be $72,360.78. That wouldn't be bad

---

**1.** It is lucky the arithmetic stopped at age 60. Had it been continued to age 65 it works out to an additional $1,900,000.00 in earnings for the final five years.

**2.** The income taxes alone on the last year's earnings would be a monstrous chunk, but plaintiffs still argue that income taxes are to be ignored.

annual compensation for a widow who at the time of her husband's death was sharing in an annual taxable income of $7,680.00.[3]

■ Surely this must demonstrate that wisdom dictates that the door should not be opened to testimony like this. Such flights of fancy by an "econometrist" are of no aid to a court.[4] To permit projections like this to go to a jury would be prejudicial. I think that testimony as to the probabilities of future success of an individual is entirely proper and that it should be received. I think that guesses as to economic conditions in the dim, distant future should not be listened to, and it is without an inflation factor that I compute damages in this case.

The damage problem is to find the present worth of a series of future annual payments over a fixed period—the decedent's work life expectancy. The problem is complicated by the necessity for deducting from the future annual payments the estimated withdrawals for personal expenses of the decedent. It is further complicated by selecting a correct interest rate to arrive at present value. Without reaching the final complication, the formula to be applied is

$$a_{\overline{n}|} = \frac{1 - v^n}{i}.$$

■ The formula produces a result for a level annuity, but it does not solve for an uneven annuity which would have to result if decedents received normal progression wage increases. Although I am sure that there is a formula for an uneven annuity, I don't know it, and I think that nothing would be gained if I tried to reach the same result through the tedious process of solving for 40 separate variously deferred single payments. Instead, I find an average income for each year of decedents' work lives, and, by taking into account the probability of individual promotions as is permitted under *Hoffman v. Sterling Drug, supra*, I find that, measured by today's dollar, each of the decedents would have earned an *average* amount of $15,000.00 per year, *net take-home* pay during their work life expectancies—40 years for Mr. Faull and 41 years for Mr. Frizzell. Over the years, I think that the average deduction for personal expenses, taking into account the nature of the employment, should be $5,000.00, which leaves an average income stream of $10,000.00 from which the net pecuniary loss to the widows is to be calculated. The value of the lost income stream is to be determined by application of a reasonable interest rate in arriving at present value, and I think that the interest rate should be 6%.

■ Utilizing the formula and accepted tables, this results in an arithmetical present worth of lost pecuniary benefit of $150,462.96 for plaintiff Faull and $151,380.15 for plaintiff Frizzell. I am incapable of such precision, and I find that the actual net pecuniary loss suffered by each of the widows, J'Ette Marie Frizzell and Alva Jolyn Faull is $150,000.00. In accordance with the provisions of Rule 58, the Clerk shall forthwith enter separate judgments in favor of plaintiff Frizzell and plaintiff Faull for $150,000.00, each.

■ I have not overlooked the government's argument that Mrs. Faull's recovery should be cut way down because she has remarried. The government argues:

"Evidence of remarriage herein clearly establishes a cutoff date beyond which plaintiff should not receive damages for

---

3. More than a handfull of judges I know would like to be able to provide their widows with an annual tax free income of $72,360.78 without touching a nest egg of $1,206,013.00.

4. Arithmetic is a plaintiff's lawyer's Godsend. Simple multiplication produces astronomical answers if a per diem approach to pain and suffering is allowed. Some courts allow this in final argument. This court does not. See, *Per diem or similar mathematical basis for fixing damages for pain and suffering*, 60 A.L.R.2d 1347. I think it worse to let an "econometrist" multiply on the witness stand than it is to let counsel multiply in final argument. Both should be prohibited.

loss of society, comfort, and security, all of which are presumably provided by the new spouse. To rule otherwise would have the effect of allowing a double recovery and contravene the established case law and the Federal Tort Claims Act."

█ I have not overlooked the argument, but I surely do not agree with it, anymore than I agree with defendant's contention in the DeWeese case that a settlement he made with Metro in exchange for a covenant not to sue should be credited against the government's liability to DeWeese. I have found that there was no negligence on the part of Metro. This finding was made in connection with the government's third party claim, and no claim was advanced by plaintiff against Metro in the course of the trial on liability. In any event, in Colorado there is no contribution among joint tort feasors under ordinary circumstances. *Zimmerman v. Baca*, (1972) D.C.Colo., 346 F.Supp. 172. The settlement with Metro was one between a passenger and a common carrier for hire, and it was an agreement compromising a claim resting on very different principles of law. *Kistler v. Halsey*, (1971) 173 Colo. 540, 481 P.2d 722, holds:

> "The principle of the collateral source doctrine has been recognized by this Court in the following cases: *Pueblo v. Ratliff*, 137 Colo. 468, 327 P.2d 270; *Carr v. Boyd*, 123 Colo. 350, 229 P.2d 659; *Riss & Co. v. Anderson*, 108 Colo. 78, 114 P.2d 278; *King v. Baur Co.*, 100 Colo. 528, 68 P.2d 909. Simply stated, it is that compensation or indemnity received by an injured party from a collateral source, wholly independent of the wrongdoer and to which he has not contributed, will not diminish the damages otherwise recoverable from the wrongdoer."

I reject the government's claim for a credit for the settlement between DeWeese and Metro.

Plaintiff DeWeese was born in 1935; he has been twice married, and has three children by his first wife and one by his second

wife to whom he is now married. Prior to the crash he was in good health. He had completed two years of college and was employed as a twin-engine aircraft pilot by Oral Roberts Association between 1956 and 1959. After a stint as a restaurant manager, he returned to his employment by Oral Roberts Association and flew a larger twin-engine aircraft. Later, he arranged for the purchase of a Viscount by Oral Roberts and he became director of flight operations, as well as captain of the Viscount.

█ Understandably, DeWeese was seriously injured in the crash, and he endured extreme pain, mostly in the left forearm, abdomen and back. He underwent surgery at Fitzsimons, and was then taken to Tulsa by air ambulance. The extent of his serious injuries is explained in Exhibit 1 [the Fitzsimons hospital record] and Exhibit 2 [the records of the Tulsa hospital where additional surgery was performed]. After long hospital treatment, DeWeese was not fully ambulatory for two months after he left the hospital, and he endured many difficulties and problems. Finally, in 1973, he enrolled in an outpatient physical therapy program at St. Francis Hospital to strengthen his back, but he still has back problems. DeWeese earned no wages during 1970, 1971, 1972, 1973 and 1974. Dr. Kenkel said that the gross wage loss for those five years was approximately $85,000.00 without taking tax deductions into account. DeWeese did work with Lodestar Films during this period, but he was not salaried, and to place a value on his services to be credited against his loss of earnings is difficult to say the least. It is not unreasonable to say that he lost 75% of his potential earnings during this five year period. On a "take-home" pay basis, it is fair to find that his loss was $65,000.00. Of course, no present value factor applies to these lost earnings. His special damages are listed in Exhibit 5 and they total $7,439.35. Plaintiff is entitled to recover those special damages.

Loss of future earnings is subject to many of the frailties applicable to Frizzell

and Faull, but the calculation is further confused by the fact that DeWeese can and with his determination he will earn a living in the future. Deciding how much less he can earn than he would have earned had he not been injured is just simply not subject to any arithmetic formula which would be meaningful. Such a calculation would require all of the determinations made in the Frizzell and Faull cases plus a similar offsetting calculation of the money DeWeese can be expected to earn. All that I have heretofore said about take-home pay and inflation is fully applicable in the case of DeWeese, and I find on the basis of all of the evidence that he will earn $25,000.00 less in the future than he would have earned had he not been injured. [I recognize that in making this determination I have before me inspired expert projections which take inflation into account and predict earnings of $1,130,669 against which the expert charges $510,626.00 as the amount DeWeese will still earn, which leaves an expert's argumentative guess that plaintiff will earn a half million less than he would have earned had he not been hurt.] I have no confidence that I am right in my determination—it is just the best I can do—but I am convinced that the expert is wrong.

DeWeese worked around the home, and the expert said that his handyman's work was worth $69,632.00. I didn't at the time and I don't now understand how this precise value for tinkering is computed, and I am unconvinced that Mr. DeWeese will be unable to do many of his handyman chores in the future. I allow him nothing for household repair work.

I know not how a jury places a value on pain and suffering, past, present and future, or on loss of enjoyment of life, past, present and future, but I know that loss of enjoyment of life is an element of damages. *Wells v. Colorado College*, (1973) 10 Cir., 478 F.2d 158. No more am I aware of any arithmetic method which a judge can use in fixing damages for pain and suffering and for loss of enjoyment of life. There just isn't any measure for pain or for loss of life's enjoyment. Knowing this, I fix the value of Mr. DeWeese's pain and loss of enjoyment of life at $100,000.00, being sure that if it were a matter for his free choice, he would not volunteer to endure the pain and suffer his loss of life's enjoyment for that or for any other dollar amount. This means, then, that I find that Mr. DeWeese has sustained damages as follows:

| | |
|---|---|
| Loss of past earnings | $ 65,000.00 |
| Loss of future earnings | 25,000.00 |
| Pain, suffering and life's enjoyment | 100,000.00 |
| Specials | 7,439.35 |
| | $197,439.35 |

As provided in Rule 58, the Clerk shall forthwith enter judgment in favor of plaintiff DeWeese for $197,439.35. Costs and interest shall be taxed and allowed in accordance with law.