Robert E. DEWEESE, J'Ette Marie Frizzell and Alva Jolyn Faull, Plaintiffs-Appellees, Cross-Appellants,

v.

UNITED STATES of America, Defendant-Appellant, Cross-Appellee.

Nos. 76–2025, 76–2026 and 76–2027.

United States Court of Appeals, Tenth Circuit.

Submitted March 13, 1978.

Decided May 3, 1978.

Kenneth N. Kripke, Denver, Colo. (John L. Butler, Eldora, Iowa, on the brief), for plaintiff-appellee Deweese.

Floyd A. Demanes, Burlingame, Cal. (Joseph E. Russell, San Francisco, Cal., on the brief), for plaintiffs-appellees Frizzell and Faull.

Eloise D. Davies, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., Jo-

seph F. Dolan, U. S. Atty., Leonard Schaitman and Michael H. Stein, Dept. of Justice, Washington, D. C., on the brief), for defendant-appellant.

Before HOLLOWAY, DOYLE and McKAY, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The United States here seeks reversal of a judgment of the United States District Court for the District of Colorado awarding damages to the plaintiffs pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674 et seq. (Jurisdiction was under 28 U.S.C. § 1346.) The action grows out of an airplane crash which occurred at Stapleton International Airport October 3, 1969. A Metro Commuter Airlines Flight # 201 crashed while attempting to land.

The plane which crashed was a Beech Queenair. It was being piloted by James Faull, the deceased husband of the plaintiff-appellee. Floyd Frizzell, deceased, was the copilot and it is his wife who is the representative. The most significant witness in the case was plaintiff-appellee Deweese, who survived the crash. He was the passenger who observed the landing effort which resulted in the crash. Deweese was a licensed commercial pilot with over 4,000 hours of air time and was employed by the airline as a director of flight operations. He sat two seats behind the pilot, where he had a view of the instruments.

Deweese boarded the plane at Rawlins, Wyoming, and proceeded to Laramie, where the left wheel ran through a puddle and the left engine stopped. After a wait of about 45 minutes, the plane took off with both engines starting without any problem. It was not until the plane started its descent toward Stapleton that trouble was encountered. The left engine quit and when the plane reached a point about 300 feet above the ground, power was added to the right engine. A left turn was then commenced. From what he saw, Deweese said that this had been a missed approach. Subsequently, the plane emerged from the clouds briefly and Deweese was able to see the ground and the closed runways of Lowry Air Force Base on his left. The plane was then going south. The ceiling did not permit him to see the ground again until just before the crash, when the plane was about 50 feet above the ground, and at this time he saw power lines in the flight path and saw the pilot pull back on the stick in an effort to avoid the lines. When the air speed decreased below 100 knots, he yelled at the crew to maintain "critical single engine control speed." The engine stalled at a speed of about 80 knots and the plane crashed.

Other crucial evidence was provided by a transcript of the tape recorded conversations between the controller and the plane during the approach.

## SUMMARY OF CRUCIAL EVENTS AS SHOWN BY THE EVIDENCE

The evidence showed that:

1. Metro was on a regular approach to Denver from Laramie when its left engine quit or had to be shut down because of icing. Controller Phillips then gave them a vector for an approach to Runway 26 L at Stapleton and said he would get them right on in.

2. It was originally intended that Metro would make an ILS (instrument) landing, but they had some trouble aligning themselves with the localizer beam which would guide them in.

3. Phillips offered Metro a radar surveillance approach, under which the controller monitors the plane on the radar screen and gives it directional headings to guide it in. He did not give them updated weather information, a significant factor in the decision to accept this approach rather than the ILS. Lack of weather information made a surveillance approach more difficult. Phillips also failed to give an updated altimeter setting, as was required. This is said to have caused the plane to be about 30 feet higher than they thought they were on approach.

4. Metro was not properly aligned with the runway when it went down and couldn't see the runway, thus it missed its approach.

5. Because Phillips had failed to give a specific missed approach procedure *before* the final approach (as was required), the pilot followed a published standard missed approach procedure of a left turn south over Englewood. Phillips did not give new headings immediately after the missed approach, thus losing precious time.

6. After the missed approach Phillips' attention was diverted by a conversation with another airplane at a crucial time. After this he lost track of the position of Metro. It was at that time that Phillips gave a heading inconsistent with Metro's true position. If he had given this heading, or another one, at the time the plane was where he thought it was later, he might have gotten them down.

7. Phillips attempted to get them lined up with Runway 35 at Stapleton, but the plane was losing altitude rapidly. When they were just south of Lowry Air Force Base, the pilot pulled back on the stick to avoid some power lines along Alameda Avenue; the plane lost control speed, stalled and crashed on Lowry Air Force Base.

## THE TRIAL COURT'S FINDINGS

The trial court ruled that there were four significant areas in which the air controller was shown to have been negligent, wherein negligence contributed to the crash. *First*, failure to give adequate course guidance in accordance with the applicable regulations. *Second*, failure to provide Metro with the latest information as to ceiling and visibility plus appropriate altimeter setting. *Third*, failure to give a proper missed approach procedure, and *fourth*, failure to hand off other traffic and give his undivided attention to Metro.

1. The failure to give adequate course guidance was determined to have been at variance with ¶729 of the FAA Terminal Air Traffic Control Manual # 7110.8, dated October 1, 1967, which reads as follows:

> Issue course guidance and inform the aircraft of the distance each mile from the landing threshold or from the airport. while the aircraft is on final approach. Inform the aircraft when it is on course

and frequently inform the aircraft of any deviation from course. . . .

*Phraseology*:

HEADING . . . MILE/S FROM RUNWAY/ . . . AIRPORT: ON COURSE

or

SLIGHTLY/WELL LEFT/RIGHT OF COURSE

The court found that Phillips, the air controller, failed to inform Metro that it was deviating from course and failed to use the recommended phraseology. He testified that giving heading changes was sufficient to tell the pilot he was off course. There is not any clear evidence that it would have made any difference if the controller Phillips had used the terminology provided for.

Also, Phillips failed, according to the trial court's further finding, to inform Metro when it was one mile from the runway, although he had given them such notice when the plane was 1.5 miles from the runway. Phillips testified that one mile was the normal missed approach point and that he let them go beyond it because it was an emergency and he was still hoping to land them. It might have been helpful to the pilot to know when he passed the usual missed approach point so that he would know that he probably would have to execute a missed approach. Furthermore, a one mile warning might have given him more precise guidance as to when and where he should look for the runway.

2. The court found that prior to commencing its approach, Metro received weather and altimeter information, not from the controller, but from Automatic Terminal Information Service. Once the approach was begun, however, the pilot had to stay on the controller's frequency and could not switch back to the other frequency to the Automatic Terminal Information Service. Because of this the court found that the pilot was entitled to rely on the controller to advise him of changed weather conditions.

Phillips informed Metro at the very first contact that the ceiling was indefinite and 400 feet. He gave other weather information in addition. He did not, however, give an altimeter setting. About the same time there was a change in the weather information. The ceiling changed from 400 to 300. There was a change as well in the altimeter setting which Metro had received from ATIS. These changes were never communicated to Metro.

Phillips testified that the changed weather information was not before him.[1] The effect of the unknown change in altimeter setting would have been that Metro would have been 30 feet higher than its altimeter indicated. Phillips acknowledged that this 30 foot discrepancy could have made the difference between the pilot seeing and not seeing the runway on the approach.

Phillips also stated that in all probability he would have told Metro of the change in ceiling had he known about it. He insisted, nevertheless, that it was not crucial information because only the Runway Visual Range minimum of 2,400 feet was required for a surveillance approach. However, knowledge of the ceiling change could have influenced the pilot to reject the offer of surveillance approach and to be more prepared for the possibility of a missed approach due to being unable to see the runway.

Also, Phillips' failure to issue the ceiling and altimeter information was in apparent violation of federal regulations. The FAA Airman's Information Manual (August 1969), pages 1–77, provides as follows:

Unless specifically requested by the pilot, controllers will not issue the following if current information on these items is contained in the ATIS broadcast. (Note: Surface Wind Ceiling, visibility, and altimeter setting will not be omitted when the reported ceiling is below 1,000 feet or below the highest circling minimum, whichever is greater, or if the visibility is less than 3 miles.)

Not only were the weather conditions such that altimeter settings should not have been omitted, but there had been a change so that the ATIS information that Metro had received was no longer current.

¶ 701 of the TATC Manual required issuance of information to an aircraft conducting a radar approach as follows:

a. Altimeter setting.

b. Ceiling and visibility if the ceiling is reported below 1,000 feet or below the highest circling minimum, whichever is greater, or if the visibility is less than 3 miles. When such conditions exist, transmit all known changes which are classified as special weather observations as soon as the volume of traffic, controller workload, and communications frequency congestion permits.

■ It would appear, therefore, that the evidence was sufficient to support the trial court's finding that the altimeter information was vital to Metro, and it was negligent not to communicate it and that such negligence was a proximate cause of the crash.

In *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (2d Cir. 1967), it was held that a controller was negligent in failing to report to a landing plane a reduction in visibility from one mile to ¾ mile. It was said that a controller has a duty to report weather changes which, under the circumstances, a crew would consider important in deciding whether to try to land and in preparing for the conditions they would meet in landing.

■ 3. The failure to give a proper missed approach procedure derived from the requirement contained in the TATC Manual that a specific missed approach procedure be communicated to the pilot before final descent was to begin. This Phillips failed to do, notwithstanding that the missed approach was a likely possibility. Absent specific instructions from controller Phillips, the pilot followed the standard published missed approach procedure and

---

1. But the evidence shows that the Tower's equipment should have received this information.

**806**

lost valuable time. At the time Phillips instructed Metro to turn at a heading of 010 he was confused about Metro's position and even if the instruction had been followed, it came too late to help. Thus the trial court's finding on this point is supported by the evidence.

4. The failure to give undivided attention to Metro arises from the admitted fact that this was acknowledged to be an emergency by Phillips. Nevertheless, even after the missed approach he continued to communicate with other aircraft and did not hand them off to the other controller. Furthermore, he was watching two radar screens, because, having reduced the scope of his own screen to better monitor Metro, he had to watch the more distant aircraft on the AR–1 screen beside him. Phillips' attention was diverted to Western 475 and this caused him to give his 010 heading too late.

■ The trial court's findings which are set forth thoroughly and in detail in published opinion, 419 F.Supp. 147 (D.Colo. 1974), are fully supported by the evidence and need not be taken up in further detail.

## ALLEGED CONTRIBUTORY NEGLIGENCE

The government contends that the plaintiffs, representatives of Frizzell and Faull, the two crew members, are barred by their contributory negligence. The trial court, however, found that the government had failed to introduce sufficient evidence to show that the crew was negligent in the operation of the aircraft. There was some testimony regarding the ease of operation of the aircraft. However, Phillips himself testified that he considered the situation to be an emergency one after the left engine quit. There is some evidence that the crew might have operated the alternate air controls improperly, thus failing to prevent ice buildup. Deweese was unable to testify as to whether the alternate air was used to a maximum degree. He merely observed the

temperature gauge, which indicated a temperature of 50 degrees centigrade.

■ It is true that Phillips testified that the course of the plane was erratic and that the pilot did not follow his headings correctly, but this is unsupported by other evidence. A witness on the ground, after the missed approach, saw the plane flying straight. Deweese, who was a witness, said the crew was professional at all times and that there was no panic. It is true that Deweese testified to seeing the pilot pull back on the stick to avoid power lines and the fact that the plane slowed down too far and thus stalled, but it was within the discretion of the court to determine that at this point the conditions had deteriorated so far that it was impossible to salvage it and also it is possible to determine that the deterioration was the direct result of the failure of Phillips to furnish a specific missed approach procedure in advance. It cannot be said, therefore, that the court's finding is clearly erroneous.

## SUFFICIENCY OF THE AWARDS

The question of damages was taken up at a separate trial or hearing and a very extensive opinion was written and is published in 419 F.Supp. 170 (D.Colo.1976). Judgment was entered in favor of Mrs. Faull in the amount of $150,000, and the judgment for Mrs. Frizzell, as personal representative of her husband, was in the same amount. These were the amounts, although the calculation was $150,462.96 for Faull and $151,380.15 for Frizzell. The court said that it had rounded it out to $150,000.[2]

The trial court properly applied Colorado law, noting that it follows the "pecuniary loss rule." Next, the court found the ages of the decedents of the survivors and made findings also with respect to the training of the decedents. The court found also that Faull was paid $9,000 per year and Frizzell $7,800. The court's findings rejected the projections given by plaintiffs' experts.

2. One wonders how the court can arbitrarily round out a judgment by taking some of the award away from the parties. However, there was no objection to it and so the question is not before us.

The judge concluded that during the period of work expectancy each man would have earned an average, after tax, of $15,000 per year. He calculated a deduction for personal expenses of one-third of earnings and applied a discount rate of six percent.

The expert gave different projections based, first, on the assumption that these men would continue with a small airline and, secondly, on the basis that they would be hired by a major airline. In the case of Faull, the projection was that if he worked for an airline, there would be an eight percent growth rate adding up to $3,163,-023, which would be reduced as a result of deductions of personal expenses and the discount to present value of $945,722. This contemplated an eight percent growth rate. Under six percent growth rate the result was $621,636. This was a projection that assumed that he would be working for a small airline similar to the one he was working for, Metro. The projection was, of course, greater based on the assumption that he would be hired by a major airline. The eight percent analysis gave a net present value of projected earnings in the amount of $1,199,983. In the case of a six percent projection the ultimate figure was $840,675.

The results of the Frizzell analysis by the expert were $959,313, assuming an eight percent growth rate; $633,068, assuming a six percent growth rate. On the basis of his being hired by a major airline, the result figured by an eight percent growth rate was $1,106,013. In the event of a six percent growth rate, the figure given was $842,871.

The court rejected these projections and also rejected the effort to prove there would probably be inflation which would have an effect on the amounts involved.

In view of the fact that this court announced a decision on effect of inflation after the trial court's judgment was entered, this becomes the important issue for present decision. The only Colorado case is the relatively recent decision of the Colorado Court of Appeals in *Good v. A. B. Chance Co.*, 565 P.2d 217 (Colo.App.1977),

*cert. denied*, 5–21–77. It does not appear that this case was selected for official publication and is thus authoritative. The opinion states that the appellant, defendant in the trial court, objected to the consideration by the trial court of inflation in a wrongful death action. The opinion continues that the appellant challenged the error in permitting the economist to project a six percent annual increase in wages during the decedent's working expectancy and to address inflationary factors affecting damages, "contending that this testimony was speculative." The Court of Appeals said "Chance construes the net pecuniary loss rule too narrowly, and has misinterpreted the economist's testimony on inflation in light of that rule."

Noting that pecuniary loss is a proper measure of damages in a wrongful death action, the court added that such damages necessarily include estimations of the accumulations of a decedent during the probable remainder of his life. The court then said:

> It is true that the economist projected a six percent annual increase in wages during Good's work expectancy. However, he also projected inflationary factors during the same period of time, and *deducted* these figures from the projected wage increases. The economist then discounted these adjusted future earnings to present value, and Chance does not contend otherwise.

565 P.2d at 226.

Although the exact ruling is not clear from what appears in the opinion, it can be seen that the Court of Appeals has approved the consideration of inflationary factors by approving the six percent annual increase in wages in arriving at its conclusion and has also discounted these adjudged future earnings to present value. The court's action in this regard was approved and affirmed. Though this is only to be regarded as evidence from the Colorado court on the subject of inflation, it is not to be considered as disapproving of the consideration by the court of a factor of inflation while at the same time considering the discounting of the net amount of the loss to present value.

The recent case on inflation which we mentioned above is *Steckler v. United States*, 549 F.2d 1372 (10th Cir. 1977), which was argued January 26, 1977, and decided February 25, 1977, and which was an appeal from the United States District Court for the District of Colorado. This case, while rejecting the offset approach (that is discount to present value vs. inflation) to considering the inflation factor, did endorse the viewpoint expounded in *United States v. English*, 521 F.2d 63 (9th Cir. 1975). That court determined future income by considering estimated changes in the purchasing power of the dollar. This called also for discounting the future income to its present value. The Ninth Circuit did not, however, authorize any arbitrary guesswork in considering future inflationary effects. It said that the trial court should consider only such estimates. of future changes in the purchasing power of money as are based on sound and substantial economic evidence. The court did, however, approve the consideration of inflationary trends. The opinion concluded:

> On remand the court should then determine from the evidence a reasonable annual percentage figure for the purpose of accounting for probable wage inflation during the 26 year work expectancy of Steckler. In this connection we note that government counsel at trial suggested that the Bureau of Labor Statistics Reports for the 1958–72 period demonstrate an annual percentage wage increase of about six percent. The Bureau of Labor Statistics Report, covering an extended period of time, is a reliable, rough guide for the trial court's consideration of a reasonable inflation rate.

549 F.2d at 1378.

■ In the case at bar the trial court did give some effect to probable increased wages, but by its own statement regarded inflation as being too speculative. The trial court in *Steckler* allowed for absolutely no increase in wages for 26 years and so the two cases were not tried exactly the same. At the same time, we are of the opinion that the case should go back to the trial court for purposes of reconsidering the amount of the damages in view of our subsequent ruling in *Steckler v. United States, supra.*

■ The next question we consider is whether it was error for the trial court to consider future income taxes. The trial judge relied on *Sanchez v. Denver & R.G. W.R. Co.*, 538 F.2d 304 (10th Cir. 1976), wherein the court said that the facts indicated a probable tax impact, but of uncertain amount. It held that the trial court's consideration of future taxes was within its discretion. This was a FELA case. *Lewis v. Great Western Distributing Co. of Borger*, 168 Colo. 424, 451 P.2d 754 (1969), a wrongful death case, recognized in passing at least that the net pecuniary loss contemplates deduction of income taxes. It is nevertheless argued by plaintiffs that Colorado law prohibits considering taxes in arriving at the net pecuniary loss in a wrongful death case. We find no support in Colorado decisions for this position.

In *United States v. Sommers*, 351 F.2d 354 (10th Cir. 1965), this court affirmed a Federal Tort Claims award in which the trial court had considered taxes in calculating pecuniary losses to the survivors based on future earnings. We said in that case that only after tax income would have been available to provide support for the survivors.

In *McWeeney v. New York, N.H. & H.R.R. Co.*, 282 F.2d 34 (2d Cir.), *cert. denied*, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), the court held that only with higher incomes, higher than those presented, should taxes be considered. Judge Friendly, writing the opinion in *McWeeney*, was concerned about the confusion which would result from having a jury determine a question such as this.

As to the question of income taxes, this was regarded as a speculative item and the general law was that it was error for the trial court or jury to consider it in determining net pecuniary loss. It can hardly be claimed, however, at the present time that income taxes are not with us. History attests to the fact that they are.

The trial court used a six percent discount rate, notwithstanding that the expert

called by plaintiffs recommended four percent. The trial court considered this rate to be unrealistic and applied the six percent figure instead. Our view is that this six percent is not unreasonable if inflation is taken into account and a realistic annual rate of inflation is considered and brought into play. Most economists would not regard this as speculative.

Our conclusion is that although we do not agree with all of the rhetoric contained in the trial court's opinion on damages, we are of the opinion that the results which it reached should be generally affirmed. The exception we have is the rejection of the presence of inflation. In so ruling we note that the court fully considered income taxes and the actuarial reduction of the award of future earnings to present value, so, as the judgment stands it is somewhat lopsided. We are not saying that pipe dreams should be the basis for the award of damages. Sound principles of law and evidence, including the recognition of continuing inflation, are to govern.

The judgment of the district court is affirmed with the exception noted, and the cause is remanded for further proceedings consistent with the foregoing opinion.