**In re AIR CRASH DISASTER AT JOHN F. KENNEDY INTERNATIONAL AIRPORT ON JUNE 24, 1975.**

Nos. 5, 6, Dockets 78–7596, 79–7063.

United States Court of Appeals,
Second Circuit.

Argued Dec. 4, 1979.

Decided Oct. 6, 1980.

Melvin I. Friedman, New York City (Kreindler & Kreindler and Speiser & Krause, P.C., with Milton G. Sincoff, Frank H. Granito, Jr., John R. Altieri, Michael W. Foster, New York City, on the brief), for plaintiffs–appellees.

Walter E. Rutherford, New York City (Haight, Gardner, Poor & Havens, Alan D. Reitzfeld, New York City, of counsel), for defendant–appellant, Eastern Air Lines, Inc.

Before WATERMAN, MOORE and MANSFIELD, Circuit Judges.

MOORE, Circuit Judge:

This case involves the tragic crash of an Eastern Air Lines, Inc. ("Eastern") Boeing 727 jet aircraft at John F. Kennedy International Airport ("JFK") in New York City on June 24, 1975. Defendant Eastern, operator of the aircraft, appeals from a judgment of liability after a jury trial in the Eastern District of New York (Honorable Henry Bramwell, District Judge). Eastern alleges various reversible errors committed during the trial and in the Judge's charge to the jury, and requests a new trial. Although many facts dealing with this disaster will be discussed as specific points are addressed, a brief overview of the crash and subsequent legal actions is required.

On June 24, 1975, Eastern Flight 66 left New Orleans at 1:19 P.M. (all times are Eastern Daylight Time) bound for JFK. The plane made an uneventful trip to the New York area and prepared to land at the airport beginning around 3:30 P.M.[1] At that time, a severe thundershower was in the vicinity of the airport. Eastern 66 was aware of the thundershower both by observation and by reports of wind shifts and lower visibility at the airport (App. 3545–47, 3537). Eastern Flight 902, which preceded Eastern 66 by about seven minutes, implemented a missed approach on Runway 22L at JFK because of severe wind shear experienced at the approach end of Runway 22L. Two other planes subsequently landed on Runway 22L. The next plane in the sequence to land was Flight 66. As Eastern 66 approached the runway, it evidently was caught in a wind shear which caused it to crash some 2500 feet short of the runway. The accident killed 113 persons; 11 survived.

Much litigation arose from the tragedy. Many plaintiffs brought suit against a variety of defendants, and the Judicial Panel on Multidistrict Litigation transferred all cases to Judge Bramwell in the Eastern District of New York. On December 15, 1977, after pretrial discovery, Judge Bramwell trans-

---

1. This is the time at which Kennedy Approach Control began giving radar vectors to Eastern 66. These vectors were given to allow the flight to land (in the proper sequence) on Runway 22L at JFK.

ferred all passenger cases to his court in the Eastern District. These actions, some of which form the basis of this appeal, were set for trial on the question of liability only against defendants Eastern and the United States of America (employer of the allegedly negligent JFK air traffic controllers).

Before trial, the United States chose not to contest liability. Eastern then decided to go to trial on the liability issue, after Judge Bramwell refused to let the damages trial against the government go forward until Eastern's liability was ascertained. On October 31, 1978, a jury found Eastern liable for its negligence in the crash. Eastern sought to appeal the liability judgment under 28 U.S.C. § 1292(b) based on certain alleged reversible errors. The certification to appeal was granted by the District Court, and this Court granted the appeal on January 16, 1979.

### I.

Eastern's appeal sets out purported errors made during the six week trial. The airline does not claim that there was insufficient evidence to present to the jury, but rather claims that the refusal to admit evidence and the prejudicial charge to the jury denied Eastern a fair trial. Before addressing the individual allegations of error, we must review the evidence of negligence offered by the plaintiffs.

Plaintiffs claimed that both Eastern and the Government were liable for negligence resulting in the plane crash, Eastern for its operation of and failure to provide information to Flight 66, and the Government for failing to give weather data to Flight 66 as it sought to land. Eastern contested its liability after the Government had admitted liability, evidently claiming that the Government's negligence was the sole proximate cause of the air crash.

The evidence that plaintiffs presented dealing with the negligence of Eastern's managers, its ground staff, and the personnel on Flight 66 was substantial, and a jury could properly hold Eastern liable as the sole tortfeasor or as a joint tortfeasor based on those facts. Upon review of this evi-

dence, the transcript of the trial, and the errors alleged by Eastern, it is our opinion that Eastern had a full opportunity to state and prove its defense and that the trial was conducted fairly and properly.

Briefly, the evidence adduced at trial showed possible negligence by Eastern's management in allowing pilots to land in thundershowers and possible negligence by the Eastern ground personnel for not updating the weather conditions and telling the pilot that severe thunderstorms were in the area. In addition, there was much evidence of negligence by the crew of Eastern 66: The co-pilot was flying the approach rather than the Captain; the Captain failed to read out altitude, air speed and rate of descent at certain heights (400 feet and 300 feet) as required by the aircraft and Eastern's manuals; the target speed of the plane during the landing was too low; and the co-pilot improperly proceeded below the decision height (the height at which a missed approach decision must be made) without having the runway environment clearly in view, as the Federal Air Regulation (14 C.F.R. § 91.117(b)(2) (1979)) provides.

In addition, the flight crew of Eastern 66 was aware of the severe weather conditions both by seeing white caps on the ocean (App. 3531–32), "black tunnels" in the clouds (App. 3545) (indicating severe weather conditions) and by reports from the airport concerning wind shifts and lower visibility. The crew also heard a severe wind shift report from Flight 902, another Eastern flight, which had executed a missed approach because of severe wind shear minutes before Flight 66 crashed. Thus, the Eastern 66 crew was well aware of the dangers at the end of the runway but chose to ignore all warnings, even those of their fellow flight officers, and attempted to land the aircraft. A jury, relying on all these facts, could properly find Eastern's negligence a proximate cause of the air crash.

Any error which Eastern asserts must be prejudicial before we will grant a new trial. We are not concerned with "errors or defects which do not affect the substantial

rights of the parties". 28 U.S.C. § 2111 (1976); Fed.R.Civ.P. 61. Furthermore, appellant Eastern has the burden of proving that the errors affected the substantial rights of Eastern as they relate to this trial. *Palmer v. Hoffman*, 318 U.S. 109, 116, 63 S.Ct. 477, 481, 87 L.Ed. 645 (1943). We hold that most of the errors alleged by Eastern were not error and, furthermore, that those alleged errors and other errors that may indeed have been committed were all harmless.

## II.

### THE ERRORS ALLEGED BY EASTERN:

1. The Refusal of the Judge to Allow Eastern to Read Stipulated Facts Into the Record.

When this litigation still involved Eastern, the United States, and the various plaintiffs, all litigants entered into a stipulation of facts for the impending trial. Some of these facts were agreed to by all, but others were disputed by one of the defendants, either Eastern or the Government. During the trial, plaintiffs' attorneys sought to read certain of these facts into the record. These facts dealt primarily with "hard" information such as the time the plane left New Orleans, the fact that the plane was operating normally, and the fact that Eastern owned the aircraft. (App. 756–59). Eastern's attorney followed as plaintiffs' attorney read the facts, and assented to all of them, stating "That's agreed" or "yes" or "Okay". (App. 756, 758). Later in the trial, Eastern sought to read into evidence certain other facts that were in the stipulation. (App. 1971–73, A105–114). These facts not only dealt with "hard" information such as the fact that the air controllers were government employees and the dimensions and lighting of JFK runways, but also dealt with allegations which would establish the negligence of the United States. These "soft" facts included allegations that the Government air controllers knew of the adverse weather conditions but neglected to inform Eastern

66 of the conditions, that they neglected to change the runway used for landing approaches, and that the controllers failed to solicit information from the two planes that landed immediately before Eastern 66 even though both had encountered severe wind shear. (App. A105–114). Plaintiffs' counsel, although willing to allow in the "hard" facts such as the runway dimensions and runway lighting, vigorously objected to the "soft" facts dealing with the United States' negligence (App. 1962–63, 1976, 1984–85). The Judge allowed Eastern to make an offer of proof as to any of these facts, but refused to allow them to read from the stipulation.

Eastern did submit evidence to the jury of the United States' negligence (i. e. the negligence of the air controllers), which tracked the allegations of the stipulation. For example, Eastern solicited from plaintiffs' expert witness the facts that the air controllers should have given weather information to Eastern 66 and should have requested weather information from the two planes that landed before Eastern 66. (App. 1877–80). That witness also opined that Eastern 66 would not have made a landing approach had it received such information. (App. 1879–80). Additionally, Eastern introduced a transcript of the Local Controller Communications (App. 3464–3500) which clearly shows that the Government controllers knew of the severe wind shear and that there had been requests to change the runway for landing approaches. (App. 3487–89). Thus, this information was conveyed to the jury, although not by reading from the stipulation.

■ It was not error to require Eastern to submit evidence of the United States' negligence rather than read from the "stipulation". The nature of the stipulation and the patent difference in the facts read by the plaintiff and those requested to be read by Eastern lead us to the conclusion that the trial Judge was correct.

The facts which plaintiffs read were stipulated to *by all parties* except in three cases. The Government partially denied two facts: (1) that Eastern 66 was being

piloted by the co–pilot during the approach and up until the crash (Fact 14, App. A100), and (2) that Eastern 66's engines were functioning properly (Fact 17, App. A101). The Government disagreed with these only because they did not agree that the co–pilot was properly operating the plane or that the engines were being properly operated. (App. A126). These partial refutations did not affect these facts as they were presented to the jury. The other disputed fact presented by plaintiffs (Fact 26(a), App. A102) concerned the instrument landing system on Runway 22L. Only Eastern denied this in the supplementary stipulation (App. A145b), and they did not object to its introduction at trial. All other facts presented by plaintiffs were *undisputed* stipulated facts.

The facts sought to be introduced by Eastern involved both undisputed and vigorously disputed facts. Plaintiffs did not object to the introduction of the undisputed facts such as runway dimensions (App. 1985). However, the plaintiffs did object to the introduction of the disputed facts, all dealing with the Government's negligence, which were vigorously disputed by the Government in the stipulation. Thus, plaintiffs introduced only undisputed "hard" facts, while Eastern sought to introduce facts which were contested.

Furthermore, the settlement by the United States was a "dramatic change in circumstances" (App. A190), as Eastern's attorney characterized it. Consequently, plaintiffs were not bound by the disputed portions of the stipulation.

2. The Refusal of the Judge to Allow the Playing of the One Channel of the Cockpit Voice Recorder [2] by Itself.

■ This purported error was an action clearly within the discretion of the trial judge. He ruled, under Fed.R.Evid. 106,

that the one channel of the tape was an integral part of the entire tape. The judge heard the tape five times, and then decided it must be played all at once. It was clearly not error to require the tape to be played in that manner.

Federal Rule of Evidence 106 requires any other part of a writing or recorded statement to be admitted "which ought in fairness to be considered contemporaneously with" [the written or recorded statement]. F.R.Evid. 106. Rule 106 applies to tape recordings. 1. J. Weinstein, *Evidence*, ¶ 106[01] at 106-10. The Judge properly required that the entire tape be played, with adjustments in the volume to make the channels of the tape clearer.

*Fountain v. United States*, 384 F.2d 624 (5th Cir. 1967), *cert. denied*, 390 U.S. 1005, 88 S.Ct. 1246, 20 L.Ed.2d 105 (1968), does not support Eastern's position, but rather supports the ruling of the Judge. The relevant part of that case dealt with the admissibility of a noise–suppressed copy of a tape recording. The court allowed the noise–suppressed tape to be admitted. Appellant contends that, similarly, the cockpit tape should be played without the other channels. However, the only thing removed from the tape in *Fountain* was

"the noise between words. . . . [I]f a signal is coming through and a man *stops talking* or an individual *stops talking* and there is noise in the background, it removes this noise, *but only this noise . . . This at no time is affecting the original tape.*" 384 F.2d at 629 n. 4. (emphasis supplied).

3. The Refusal of the Judge to Allow in the National Transportation Safety Board (NTSB) Chart.

Eastern sought to have an NTSB chart admitted into evidence. The chart compared the established glide slope path [3] with

---

**2.** The aircraft had on board a crash–resistant tape recorder which recorded the last 30 minutes of conversation in the cockpit area. The tape has four channels: one picks up intra–cockpit sounds from a microphone in the cockpit, the other three pick up radio transmissions from the headsets worn by the pilot, co–pilot

and flight engineer. Eastern wanted only the intra–cockpit sound channel to be played.

**3.** The glide slope is part of the Instrument Landing System. It is an electronic beam fixed at a 3° descent and was used by landing aircraft for vertical guidance.

the actual path of Flight 66. This was relevant because plaintiffs sought to prove that Eastern had deviated from the glide slope path. Plaintiffs' attorneys objected on two grounds: (1) that the evidence was misleading and confusing and (2) that 49 U.S.C. § 1441(e) (1976) (Section 701(e) of the Federal Aviation Act) precludes the use of any NTSB documents.

■ We hold that exclusion of this evidence was clearly within the trial court's discretion under Fed.R.Evid. 403. The thickness of the lines on the chart, and the fact that the times of conversation marked on the chart did not match the stipulated conversation times could have misled the jury. The times are not *de minimis.* (App. 2407). The plane was traveling about 250 feet per *second* (based on 140 knots) (App. 2427) immediately before the crash. It would have made the runway in ten seconds. We believe the Judge's ruling was correct.

4. The Remarks of the Plaintiffs' Attorney Regarding the Failure of a Deposed Witness to Appear at Trial.

In the summation of one of the plaintiffs' attorneys, mention was made of the fact that one of Eastern's witnesses did not come to testify at trial, but rather that his deposition was taken and read at trial. The Judge had instructed the attorney not to make mention of that fact. Eastern seeks a new trial based on this error.

■ While we do not approve of counsel's obvious disregard of an instruction to the attorneys, we do not think it affected the substantial rights of Eastern. The Judge did state in the jury charge: "[Deposition] testimony is entitled to the same consideration and is to be judged as to credibility and weighed and otherwise considered by you in the same way as if the witness had been actually present in court...." (App. 3260). This charge to the jury helped mitigate whatever impact on the jury counsel's insinuations may have had.

With all due respect, the dissent overemphasizes the impact of this point on the jury. Plaintiffs' counsel only mentioned that Button was not called to testify. (App. 3186, 3209, 3214). The reason the failure to be called was mentioned was to *emphasize* that testimony, not to indicate that Button was to be disbelieved or was unwilling to testify. As plaintiffs' counsel stated "They [Eastern] were hoping that you [the jury] would fall asleep when Button's deposition testimony is read". (App. 3209). In fact, plaintiffs' counsel stressed the fact that deposition testimony is to be treated the same as live testimony. "It's [Button's deposition] their admission, just as if it came from that witness stand". (App. 3209). We feel the curative instruction mitigated the adverse impact, if any, on Eastern which this comment may have had.

5. The Refusal of the Judge to Allow in Evidence That the United States Had Consented to a Liability Judgment.

■ The Judge refused to allow in the fact that the United States had consented to liability or that the United States and Eastern had agreed to a 40/60 split of any damages. It was not error to do so. Federal Rules of Evidence 403 allows the trial judge to exclude misleading evidence. We believe the Judge properly excluded the information because it would have only served to mislead the jurors and confuse the issues. (App. 177).

6. The Charge to the Jury.

■ Finally, Eastern asserts that the charge to the jury was prejudicial and deprived Eastern of a fair trial. Plaintiffs counter that the charge was fair and balanced, and that objection to some portions of the charge were not properly made. We reject the latter contention: Federal Rule of Civil Procedure 51 read in conjunction with Rule 46 requires only a minimal objection to a jury charge. 5A J. Moore, *Federal Practice* ¶ 51.04 (2d ed. 1979). Eastern satisfied that requirement. However, the

charge, although not a paradigm of clarity and succinctness, was, on balance, sufficient to apprise the jurors of their function and of the law they were to consider in rendering their verdict. We treat the allegations of error seriatim:

(a) *The duty to others charge.*

Eastern asserts that various paragraphs of its Proposed Charge dealing with the duty of others to Eastern should have been charged. These included basically the duty of the air controllers to report weather conditions to Flight 66 and the duty of the planes that landed before Eastern 66 to report wind shear to the tower. We feel that the charge sufficiently addressed these points. Judge Bramwell charged "However, before a pilot can be held legally responsible, he must be supplied with those pertinent facts that he is not in a position to know for himself. Those pertinent facts which the air traffic controllers ... were expected to provide included current weather information". (App. 3281). Additionally, the Judge charged the jury with two Federal Aviation Regulations, one which dealt with strict adherence to Air Traffic Controller directions (App. 3280) (suggesting that Eastern had to land once cleared to land) and the other which dealt with the requirement that pilots flying under Instrument Flight Rules (IFR) must immediately report "Any unforecast weather conditions encountered". (App. 3281). Finally, the Judge allowed Eastern to argue the essence of these Proposed Charges in its summation.

This aspect of the charge was clearly correct. It conveyed to the jury the fact that the Eastern crew could rely on the Air Controllers and other pilots to provide them with weather information, but that the crew was not absolved from responsibility for negligence related to weather they

could clearly see (the black tunnels) and hear about (Flight 902's report of wind shear). The law is clear that one cannot fail to use his or her own eyes and ears to offset obvious negligence by another. *Boerio v. Haiss Motor Trucking Co.*, 7 A.D.2d 228, 181 N.Y.S.2d 823, 827 (1959); *Townes v. Park Motor Sales, Inc.*, 7 A.D.2d 109, 180 N.Y.S.2d 553, 556 (1958). Indeed, the Judge charged language from an opinion which pinpointed this aspect of negligence in airline crashes:

The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes and instruments. *Spaulding v. United States*, 455 F.2d 222, 226–27 (9th Cir. 1972) (footnote omitted) App. 3282.

We think the judge properly instructed the jury as to the duty of others to the Eastern personnel and the duty of the Eastern crew to use all reasonable means and information to avoid a crash.

(b) *The New York State Aeronautical Statute Charge.*

Judge Bramwell charged the jury that they should consider whether Section 245(1) of New York's General Business Law [4] applied to the facts as they found them. That statute prohibited the operation of an aircraft in a careless or reckless manner. Eastern contends that the Judge improperly delegated to the jury his obligation to present and decide the law, and that the state statute was preempted by federal statutes.

We find both arguments to be meritless. By stipulation, New York Law applied to this section, and the federal statute does not preclude common law remedies. 49 U.S.C. § 1506 (1976). Furthermore, the Judge allowed the jury to find the facts, and instructed them only to "say

4. N.Y. General Business Law § 245(1) (McKinney)

§ 245. Air traffic rules
 The following air traffic rules shall govern the operations and use of aircraft in New York state, except that they shall not apply to aircraft used exclusively in the govern-

mental service of the United States, or exclusively in the service of the national guard of this state:
 1. Careless or reckless operation. No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

whether this section of the law has any application to the facts as you find them to be from the evidence". (App. 3272). Surely whether the pilot was reckless or not was a fact question for the jury. Eastern's argument is not persuasive.

(c) *The "special knowledge" charge.*

Judge Bramwell charged the jury that the Eastern personnel must be held to a higher standard of care because of their professional status. Eastern objects to this charge contending that Eastern's Radio Controller did not possess special skills. Eastern does not contest the charge as to its pilots. (Appellant Br. 46). Suffice it to say that the operations clerk must have had some skill in gathering weather data and relaying it to Eastern pilots, sufficient to warrant a charge of "special training and experience". Regardless, this portion of the charge was not such to amount to reversible error. Sufficient evidence of the negligence of the pilots and Eastern management was presented to sustain the verdict. We do not think this portion of the charge, even if it were error to charge, was so misleading as to preclude the jury from fair consideration of the case.

(d) *The Federal Air Regulations (FAR) charge.*

The Judge charged the jury to consider certain FAR and to determine if "any of these regulations are applicable to the facts as you find them". (App. 3279). If they were, the Judge then instructed the jury to consider whether Eastern had failed to comply with those regulations and whether non–compliance was a proximate cause of the crash. Then, "such noncompliance may be considered by you as some evidence of negligence on the part of Eastern Airlines". (App. 3279).

Eastern makes two objections to this aspect of the charge: first, that these regulations were not "minimum standards of safety" as the Judge charged, and that second, various regulations that were charged, were inapplicable or confusing.

To begin, these regulations do outline minimum standards of safety. The language in 49 U.S.C. § 1421(a)(6) (1976) is clear:

"The administrator is empowered and it shall be his duty to promote safety of flight of civil aircraft in air commerce by prescribing and revising from time to time:

(6) Such reasonable rules and regulations, *or mimimum standards*, governing other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for . . . safety in air commerce." (emphasis supplied).

The legislative history is also clear:

"This title deals primarily with the powers and duties of the Administrator relating *to minimum standards of safety* . . . ." H.R.Rep.No. 2360, 85th Cong., 2d Sess. *reprinted in* [1958] U.S.Code Cong. & Admin.News, pp. 3741, 3756 (emphasis supplied).

Thus, these regulations do prescribe minimum standards of safety for aircraft personnel.

Concerning the various regulations that were charged, although they were not very eloquently outlined, they were potentially applicable to the facts as the jury might find them. Eastern maintains that there was no evidence of non–compliance with certain of these regulations.[5] How-

---

5. 14 C.F.R. (1979):
 § 91.5 Preflight action.
 Each pilot in command shall, before beginning a flight, familiarize himself with all available information concerning that flight. This information must include:
 (a) For a flight under IFR or a flight not in the vicinity of an airport, weather reports and forecasts, fuel requirements, alternatives available if the planned flight cannot be com-

pleted, and any known traffic delays of which he has been advised by ATC.
 § 121.101 Weather reporting facilities.
 (a) Each domestic and flag air carrier must show that enough weather reporting services are available along each route to ensure weather reports and forecasts necessary for the operation.
 § 121.533 Responsibility for operational control: domestic air carriers.

ever, as the plaintiffs clearly outline (Appellee Br. at 47–48) these regulations cumulatively create a duty of the aircraft dispatcher to relay information to the pilot concerning the weather, and a duty of the pilot to make sure he is so informed. There was evidence that the pilot and the aircraft dispatcher had not complied with these regulations. (App. 1225–46; 1366–72). This included evidence that an Eastern clerk had not passed on information of a "strong wind warning" to Flight 66 and that certain other relevant weather information had not been given to Flight 66.

Eastern also objects to other charged regulations which dealt with control of the aircraft and the necessity of preparing Operating Manuals.[6] FAR 91.3(a) might have been relevant to the facts that the co-pilot was piloting the aircraft and that, according to the regulation, the pilot had final authority, even over the air traffic controllers. The other regulations established that the Eastern Manual might be some evidence of the standard of care which Eastern

> (a) Each domestic air carrier is responsible for operational control.
> (b) The pilot in command and the aircraft dispatcher are jointly responsible for the preflight planning delay, and dispatch release of a flight in compliance with this chapter and operations specifications.
> (c) The aircraft dispatcher is responsible for–
> (1) Monitoring the progress of each flight;
> (2) Issuing necessary information for the safety of the flight; and
> (3) Cancelling or redispatching a flight if, in his opinion or the opinion of the pilot in command, the flight cannot operate or continue to operate safely as planned or released.
> (d) Each pilot in command of an aircraft is, during flight time in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane.
> (e) Each pilot in command has full control and authority in the operation of the aircraft, without limitation, over other crewmembers and their duties during flight time, whether or not he holds valid certificates authorizing him to perform the duties of those crewmembers.
> § 121.551 Restriction or suspension of operation: domestic and flag air carriers.
> When a domestic or flag air carrier knows of conditions, including airport and runway

was required to use. The "high degree of safety" language in FAR 121.135(a)(1) did not confuse the jury, but was consistent with the charge concerning the duty to others owed by specially trained and experienced personnel. On balance, we feel that this aspect of the jury charge properly conveyed to the jury that these regulations, as applied to the facts, outlined a standard of care against which Eastern could be tested. Thus, non-compliance with these regulations could be considered by the jury as "some evidence of negligence on the part of Eastern Airlines." (App. 3279).

(e) *The Federal Aviation Administration Advisory Circular (AC) Charge.*

 Eastern complains of the charge which related to the admission in evidence of certain AC's. (App. 3284–86). Eastern claims they are advisory only and do not attempt to set standards of conduct. The court in *Muncie Aviation Corp. v. Party Doll Fleet, Inc.*, 519 F.2d 1178 (5th Cir. 1975), addressed this problem and stated:

> conditions, that are a hazard to safe operations, it shall restrict or suspend operations until those conditions are corrected.
> § 121.601 Aircraft dispatcher information to pilot in command: domestic and flag air carriers.
> (b) During a flight, the aircraft dispatcher shall provide the pilot in command any additional available information of meteorological conditions and irregularities of facilities and services that may affect the safety of the flight.

6. 14 C.F.R. (1979):
§ 91.3 Responsibility and authority of the pilot in command.
(a) The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft.
§ 121.133 Preparation.
(a) Each domestic and flag air carrier shall prepare and keep current a manual for the use and guidance of flight and ground operations personnel in conducting its operations.
§ 121.135 Contents.
(a) Each manual required by § 121.133 must-
(1) Include instructions and information necessary to allow the personnel concerned to perform their duties and responsibilities with a high degree of safety. . . .

"The relevance of the [AC's] to the [issue] of the defendant's negligence ... is manifest. Evidence of custom within a particular industry, group, or organization is admissible as bearing on the standard of care in determining negligence. Compliance or noncompliance with such custom, though not conclusive on the issue of negligence, is one of the factors the trier of fact may consider in applying the standard of care." 519 F.2d at 1180–81 (footnotes omitted).

Judge Bramwell charged the jury in this case:

"[The AC's] may be considered by you in determining the standard of care that a reasonably prudent person would have exercised under the circumstances." (App. 3285).

The advisory material was admissible to aid the jury in formulating a standard of care, and the Judge properly charged the jury regarding these circulars and that standard.

(f) *The res ipsa loquitur charge.*

The last problem Eastern raises is that Judge Bramwell improperly charged the jury that the doctrine of *res ipsa loquitur* might apply to this situation. We believe that the *res ipsa loquitur* charge might have been applicable to this fact situation. As Eastern admits, the doctrine is generally applicable to aircraft crash cases. (Appellant Br. 48). *Abbott v. Page Airways, Inc.,* 23 N.Y.2d 502, 297 N.Y.S.2d 713, 245 N.E.2d 388 (1969). Eastern claims it should not be used when evidence of a specific reason for the crash (*e. g.,* air turbulence) is undisputed. The cases Eastern cites (Appellant's Br. 48) are not on point. All deal with "clear air turbulence" involving sudden unexpected lurches of planes, and none deals with a crash of an aircraft. *Citrola v. Eastern Air Lines, Inc.,* 264 F.2d 815 (2d Cir. 1959) is controlling. The court there allowed a *res ipsa loquitur* charge even though there was evidence of what was the specific cause of the crash.

■ It was not solely the known and anticipated wind shear which caused this accident, for plaintiffs offered evidence that other negligent acts of various parties (including Eastern personnel) caused the crash. Other planes had landed during the same time period, some landing and one "going around", but none crashed. Eastern's statement that the evidence showed that the accident would not have occurred had there not been violent weather at the end of the runway (Appellant Reply Br. 21) is misleading. Certainly, the evidence was also to the effect that the plane would not have crashed if the pilot had received all pertinent weather reports and had not attempted to land.

■ We note that the Judge charged "this is an inference you may draw but are not required to draw". (App. 3252). Furthermore, the way the charge to the jury was structured, the jury would have had to find Eastern negligent before *res ipsa loquitur* was even considered. Although this aspect of the charge could have caused minimal jury confusion, based on the jury charge read as a whole we are of the opinion that any possible error or confusion caused by the *res ipsa* charge was remedied by the warning concerning the drawing of the inference and the remainder of the charge.

On the whole, this case was properly presented to the jury, and the jury was subsequently charged in accordance with the law. We are convinced that the few errors which may have occurred during this six week trial did not affect the substantial rights of Eastern. Based on the evidence the jury found that Eastern Airlines was negligent in its operation of Flight 66, and was liable to the ill-fated passengers.

We affirm the judgment of liability.

WATERMAN, Circuit Judge, concurring:

I am in complete agreement with the thorough, well-reasoned opinion of Judge Moore. However, in view of the able and forceful opinion of our dissenting colleague, I believe that I should set forth in some detail certain further observations concerning the trial court's exclusion of the so-called stipulated material facts.

As an initial matter, I agree with the dissent's characterization of Eastern's primary defense at trial, that any negligence on the part of Eastern's management, its ground employees, or the crew of E–66 did not play a substantial causative role in the crash. Of course, although the jury's verdict for plaintiffs is inconsistent with a finding that any negligence on the part of the Government was the *sole* proximate cause of the disaster, the jury in reaching the plaintiffs' verdict could have found that the Government was negligent and that this negligence was a substantial causative factor in the crash. I do not read the dissent to suggest, nor did Eastern contend at trial, that such a finding of concurrent causation, given the facts of this case, either would be an impermissible inference for the jury to draw or would be contrary to settled case law. *See, e. g., Ingham v. Eastern Air Lines, Inc.,* 373 F.2d 227, 236–37 (2d Cir. 1967), *cert. denied,* 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1968) (Government's negligent failure to provide up–to-date weather information to crew of plane attempting landing approach held to be proximate and concurrent cause of resulting accident).

Turning now to the issue of the trial court's exclusion of the so–called stipulated material facts, Eastern's argument at first blush appears to be as follows: that a certain bundle of facts existed in this case, which were agreed to by plaintiffs and Eastern, but disputed by the Government; that the trial court permitted plaintiffs to read to the jury, as stipulated facts, facts from this bundle; and that when Eastern subsequently attempted to avail itself of this same privilege, it was stymied by the adverse ruling of the trial court. In es-

sence, Eastern appears to allege some violation of "fundamental fairness" brought about by the trial court's abrupt switching of the rules after plaintiffs had presented their case.

My examination of the underlying facts, however, indicates that the trial court, rather than treating two apparently similar sets of facts differently, merely refused to afford similar treatment to two apparently different sets of facts. As already noted by Judge Moore, all but three of the facts which plaintiffs requested be stipulated were admitted, without reservation or qualification, by the plaintiffs, by Eastern, and by the Government. Although the Supplementary Stipulation identified the remaining three facts as "in dispute," a closer look at the background of these three "exceptions" leads me to conclude that two of these facts were mischaracterized as being in dispute, and that the third would not have been treated as stipulated but for Eastern's failure to make an objection at trial to plaintiffs' request.

The two allegations which the Supplementary Stipulation mischaracterized as "in dispute," together with the relevant responses of both Eastern and the Government, are reproduced in full in the margin.[1] Surely, the only sense in which the Government "disputed" these allegations was in attempting to limit the Government's admissions to the plainly literal language of the statements propounded by the plaintiffs. Whatever the latent implications were that the Government perceived lurking in these statements which prompted it to hedge its admissions, the Government at least admitted the literal truth of these allegations, and nothing suggests that the plaintiffs alleged these facts to establish

1. "14. Eastern 66 was being piloted by the co–pilot during the approach and up to the initial impact of the crash." (App. p. A100) [Eastern] "14. Admitted." (App. p. A121) [Government] "14. Admitted, except that the pilot remained in final authority and had full responsibility for the safety of the flight pursuant to 14 C.F.R. 91.3, 121.533." (App. p. A126)
"17. On June 24, 1975, during the flight and at the time of the crash, all of Eastern 66's jet engines were operating properly." (App. p. A101)
[Eastern] "17. Admitted." (App. p. A121)
[Government] "17. Admitted, except that it is denied that the pilot and/or co–pilot were operating the engines properly with respect to a proper positioning of the thrust levers at various states of the approach." (App. p. A126)

anything more than their literal truth. We would have to avert our gaze from reality to maintain that the classification of these facts in the Supplementary Stipulation as being "in dispute" accurately reflects the positions of the three original parties to this lawsuit.

The remaining allegation [2] follows a truly unusual course. When this allegation first appeared as Stipulation 41a in the Third Stipulation of Facts, all parties agreed that it was a true statement. (App. p. A51). When the exact same words were repeated as Allegation 26a in plaintiffs' pre-trial brief, both Eastern and the Government denied that it was a true statement.[3] (App. p. A102; p. A122; p. A127). By the time the Supplementary Stipulation was executed, only Eastern persisted in its denial of this statement. (App. p. A145(b)). Finally, when plaintiffs' counsel sought to have this statement read to the jury as a stipulated fact, counsel for Eastern made no objection. (App. p. 759). Under these circumstances, I would conclude that at a minimum Eastern failed to prove that this allegation was not admitted by the Government at the time the plaintiffs requested that it be stipulated. Furthermore, not only did Eastern fail to call the trial court's attention to the fact that the Government, on one prior occasion, had denied this statement, but Eastern also failed to object on the transparently obvious ground that its own denial of this statement presumably still continued in effect. As a consequence, Eastern should not now be heard to complain that this statement was improperly treated as stipulated.

To my mind, therefore, these three "exceptions" are actually not "exceptions" at all. Every fact treated as stipulated at plaintiffs' request properly may be regarded as facts upon which all three original parties to the lawsuit either were in agreement, or to which they waived previous objections.[4] Thus, the heart of Eastern's argument, as accurately presented by the dissent, may be addressed: that apparently different sets of facts (*i. e.*, those upon which plaintiffs and Eastern agreed, but upon which the Government did not agree) really are not different at all, because the distinguishing factor (*i. e.*, the Government's acquiescence or non-acquiescence) has become irrelevant due to the Government's intervening decision to settle with the plaintiffs and its resulting withdrawal from continued participation in the lawsuit. Respectfully, I must disagree with this argument, and so, with my dissenting colleague's acceptance of it.

One could hardly quarrel with the dissent's observation that where parties agree among themselves to certain facts, those facts properly are regarded as stipulated and will be binding upon the parties. Nevertheless, I would submit that if the development of this case is kept in perspec-

---

**2.** "26. On June 24, 1975, at Kennedy Airport, the instrument landing system (ILS)
(a) for Runway 22Left was operating properly with the published restriction that the glide slope was unusable below 200 feet mean sea level;" (App. p. A102)

**3.** The Government's denial is all the more puzzling in view of its admission (App. p. A126) of the following two allegations:
"23. On June 24, 1975, landing aids associated with Runway 22L were:
 a. high intensity runway lights;
 b. a high intensity approach lighting system with sequence flashing lights;
 c. an ILS localizer;
 d. an ILS glide slope;
 e. a middle marker;
 f. an outer marker."
"24. During the flight and at the time of the crash of Eastern 66, the landing aids associated with Runway 22L were operating properly."
Allegation 26a seems to be a logical extension of Allegations 23 and 24. This apparent relationship was not ignored by Eastern: it admitted 23, but denied both 24 and 26. (App. pp. A121-22)

**4.** At this point, I emphasize Judge Moore's observation that plaintiffs were willing to permit Eastern to treat facts of a similar nature (*i. e.*, those upon which all three original parties to the lawsuit had agreed) as stipulated. Eastern, *however, apparently adopted an "all or nothing"* position. Therefore, to the extent that certain facts that Eastern sought to have stipulated may have been of an identical nature to those stipulated at plaintiffs' request, any failure to treat such facts as stipulated is traceable to the intransigent position adopted by Eastern on this issue.

tive, the trial court's refusal to treat facts "agreed to" between plaintiffs and Eastern as stipulated is readily explainable and fully justified. Both the explanation and the justification become apparent once the necessary effects on the plaintiffs' trial strategy of the Government's presence (and subsequent absence) as a defendant in the case are recognized.

Initially, the plaintiffs instituted this lawsuit against both Eastern and the Government on a joint tortfeasors' theory of liability. At the risk of belaboring the obvious, the very nature of a joint tortfeasors' theory of liability partially alters the usual adversarial relationship between the plaintiff and each individual defendant. Normally, a plaintiff who aggressively presents his case against a single defendant will not thereby confer any unintentional benefits on any other defendant. Where a plaintiff proceeds under a joint tortfeasors' theory of liability, and thus is required simultaneously to present his case against numerous defendants, this is not so. A plaintiff in such a situation must walk a tactical tightrope; if he presents too strong a case against one defendant, he runs the risk of exculpating the remaining defendants.

In the pre–trial stages of this litigation, plaintiffs expected to find themselves walking such a tightrope, and planned their trial strategy (including the formulation of allegations) to be consistent with a joint tortfeasors' theory of liability. However, on the scheduled starting date of the trial a "dramatic change of circumstances" occurred: the Government decided not to con-

test its liability to the plaintiffs, and consequently withdrew from further participation in the trial. From this point forward, the plaintiffs literally had no case against the Government. Nevertheless, the dissent apparently would require the trial court to ignore this necessary result of the Government's actions by forcing the plaintiffs to continue to adhere to their allegations of Government negligence long after the only reason for making such allegations (*i. e.*, the Government's presence at trial as a defendant) had disappeared.

In support of Eastern's position the dissent maintains that, by withdrawing, the Government has made irrelevant its previous denials of plaintiffs' allegations of Government negligence. I would agree, but would take this observation one step farther: by withdrawing, the Government also has made plaintiffs' allegations of Government negligence irrelevant. Plainly, the Government's withdrawal transformed this litigation into a contest solely between plaintiffs and Eastern. The trial court's denial of Eastern's request to treat certain facts, which would have conclusively established the Government's negligence, as stipulated, merely recognized the logical effect of the Government's withdrawal upon the positions of the parties who actually proceeded to trial. I fail to see, given the Government's unexpected last–minute withdrawal, how fairness is served by freezing plaintiffs into their pre-trial strategic posture. To the contrary, both fairness and common sense support the decision of the trial court on this matter.[5]

5. The dissent implies that the trial court's decision somehow has enabled the plaintiffs to escape shouldering their full burden of proof at trial. In so doing, the dissent appears to misstate the burden of proof the plaintiffs would have had to meet had the case gone to trial with both Eastern and the Government as defendants. In such a situation, the plaintiffs would have to prove, by a preponderance of the evidence, that conduct on the part of both Eastern and the Government had been negligent, and that the negligence of each defendant had been a substantial proximate cause of the disaster. In accomplishing this, however, the plaintiffs would not have had to anticipate and rebut any affirmative defenses available to ei-

ther defendant. If either defendant had sought to absolve itself of liability on the ground that the negligence of the other defendant was the sole proximate cause of the disaster, each defendant would have borne the burden of establishing each element of its affirmative defense by a preponderance of the evidence. In other words, the same allocation of burden of proof prevails as in the case of a plaintiff proceeding against a single defendant.

It is true that if both defendants in this case had proceeded to trial, each could have expected plaintiffs' help in introducing evidence (of the other defendant's negligence) to serve as the foundation upon which each could begin the construction of an affirmative defense, and

Several other minor points remain to be addressed. The charge given by the trial court concerning the respective duties of the pilot and the air traffic controllers was wholly proper. Contrary to the dissent's position, a jury so charged could have found, provided they believed that the pilot and crew of E–66 conducted themselves reasonably in light of the weather conditions they could have perceived,[6] that the air traffic controllers' failure to perform their duties was the sole proximate cause of the accident. I would also take exception to the dissent's characterization of the *res ipsa loquitur* charge. The plain language of this charge seems clearly to instruct the jury that they could not apply the *res ipsa* doctrine against Eastern unless they had first ruled out the possibility that the accident had been caused by factors beyond Eastern's control.[7] Finally, the curative instruction given by the trial court, concerning the respective treatment the jury was to give "live" and deposition testimony, conveys substantially the same information as the charge requested by Eastern.[8] Inasmuch as Eastern's proposed charge did not make mention of the finer points of F.R. Civ.P. 32(a)(3)(B), the trial court did not commit error, prejudicial or otherwise, by failing to include such information in the instructions to the jury.

In conclusion, although I do not claim that this was a perfect trial, I agree with Judge Moore that whatever errors may have occurred did not affect the substantial rights of Eastern. Accordingly, I join in his

the trial court's decision merely recognizes that such aid is forthcoming only because of the inherent nature of a joint tortfeasors' situation. Although such aid properly could be characterized as a windfall to each defendant in such a situation, the same characterization is a most inappropriate way of describing a ruling that places the burden of introducing evidence to establish all elements of an affirmative defense upon the defendant who is asserting it.

On a related point, I do not read Judge Moore's opinion to suggest that no prejudice results if a defendant is given the opportunity to prove facts that properly should have been treated as stipulated. In fact, Judge Moore specifically stated that the trial court's exclusion of these so–called stipulated facts was correct, a conclusion with which I completely agree. The fact that Eastern was permitted to, and did, introduce at trial evidence of the Government's negligence merely dispels the notion that the trial court deprived Eastern of the right to assert an available defense. As the presentation of Eastern's case at trial demonstrates, the trial court's ruling went no further than holding that certain topics that are appropriate topics for proof at trial were, under the circumstances of this case, inappropriate subjects for stipulation.

6. The trial court reinforced this concept in another portion of its charge to the jury (in language which the court took almost verbatim from Eastern's requested charge):

Negligence requires both a foreseeable danger of injury to another and conduct unreasonable in proportion to the danger. Eastern Air Lines is not liable to the plaintiffs for the consequences of its acts or omissions unless the risk of injury to the plaintiffs was reasonably foreseeable. . . .

If a reasonably prudent person could not foresee any injury as a result of his conduct, or if his conduct was reasonable in light of what he could foresee, there is no negligence. On the other hand, if a reasonably prudent person could foresee injury as a result of his conduct, and if his conduct was unreasonable in the light of what he could foresee, there is negligence.

App. pp. 2941–42.

7. In concluding the res ipsa charge, the trial court specifically instructed the jury:

However, as I have already told you, this is an inference [of Eastern's negligence] you may draw [using the res ipsa doctrine] but are not required to draw *and, in any event, cannot draw if, taking into consideration all of the evidence in the case, you conclude that the accident was not due to any negligence on [Eastern's] part.*

App. p. 2931 (emphasis added).

8. In essence, Eastern requested the court to charge the jury that they should draw no adverse inferences from the fact that a witness testified by deposition, and that such deposition testimony should be given no less weight than testimony offered by live witnesses. App. p. 3241.

Judge Moore's opinion already sets forth the relevant portion of the charge actually given to the jury. I fail to grasp why an instruction to the jury that deposition and live testimony are to be considered, judged as to credibility, and weighed on a strictly equal basis fails to preclude any possibility that the jury will draw adverse inferences from, or attach less weight to, deposition testimony.

affirmance of the judgment of liability entered against Eastern in the court below.

MANSFIELD, Circuit Judge (Dissenting):

I respectfully dissent for the reason that in my view a number of serious errors deprived Eastern of a fair trial.

To appreciate the significance of these errors it is important to bear in mind the nature of the negligence claim against Eastern, its principal defense to that claim, and certain undisputed facts. The claim essentially is that the crew of Eastern 66 should have been aware of the weather conditions at the approach end of Runway 22L and, in view of the wind shear condition, should have abandoned the approach. The defense is that the JFK air traffic controllers employed by the Government's Federal Aviation Administration, which had jurisdiction over the aircraft as it proceeded on an instrument flight rules (IFR) flight plan, failed in their duty to advise it of certain severe wind shear and other conditions near the approach. Eastern contends that if the controllers had communicated these facts to Eastern 66 it would either not have commenced its final approach down the glide slope or would have executed a missed approach. In short, the defense is that the accident was wholly the Government's fault, and not Eastern's. Expert witnesses for the plaintiffs and Eastern agreed that had the relevant information been provided by the Government controllers it is unlikely that Eastern 66 would have continued with its approach.

The law is clear that an air controller has the duty of providing current weather information to pilots and warning them of hazardous conditions and that pilots have a right to expect that an air controller will use reasonable care and caution in performing that duty. *Yates v. United States*, 497 F.2d 878, 882–83 (10th Cir. 1974); *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227, 236 (2nd Cir. 1967), *cert. denied*, 389 U.S. 931, 88 S.Ct. 295, 19 L.Ed.2d 292 (1968); *DeWeese v. United States*, 419 F.Supp. 147, 166 (D.Col.1974), *affd.*, 576 F.2d 802 (10th Cir.

1978); *Martin v. United States*, 448 F.Supp. 855, 865 (E.D.Ark.1977), *affd. in part, revd. in part*, 586 F.2d 1206 (8th Cir. 1978); *Swanson v. United States*, 435 F.Supp. 654 (S.D.N.Y.1977); *Maloney v. United States*, 354 F.Supp. 480, 483 (S.D.N.Y.1972). As those cases illustrate, the failure of an air controller to warn pilots of hazardous weather conditions can be a proximate cause of an air crash. In my view the trial judge effectively denied Eastern the full effect of this defense (1) by his refusal to admit into evidence certain facts previously stipulated to by plaintiffs and Eastern, (2) by refusing to give important instructions to which Eastern was entitled, (3) by giving instructions that were in my view either erroneous or prejudicially confusing, and (4) by certain improper evidentiary rulings.

## ERRONEOUS EXCLUSION OF STIPULATED MATERIAL FACTS

Prior to trial, while the United States was still a party defendant, plaintiffs and Eastern had agreed to a "STATEMENT OF FACTS" which included, among other things, the following important paragraphs bearing upon the responsibility of the Government's air traffic–controllers in charge at JFK airport at the time of the disaster:

"33. For many years preceding the crash, the United States knew and trained its controllers to know that landing approaches in, adjacent to or under thunderstorms, particularly severe thunderstorms, were hazardous because the associated winds could cause aircraft to crash.

56. About 4:01 PM, the United States' Kennedy weather service office saw and heard thunderstorm activity, officially declared a thunderstorm in progress at Kennedy Airport, and reported that to the Common I Room and Tower Cab at 4:02 PM, but the United States never warned Eastern 66.

58. The Common I Room Controller saw on his radar scope two weather cells, one located on the final ap-

proach course for Runway 22 Left about 2 miles from the threshold and the other moving from just west of the airport toward the final approach course, but neither he nor any other employee of the United States warned Eastern 66 of the cells.

86. Under the United States' operating procedures, it was required or, at a minimum, should have

a. warned the pilots of Eastern 66 of

(1) thunderstorm or severe thunderstorm activity;

(2) the strong wind warning;

(3) rain or heavy rain and not very light rain;

(4) lightning;

(5) strong winds;

(6) strong gusts;

(7) wind shift;

(8) winds and weather more favorable for a landing approach to Runway 31 Left;

(9) the Flying Tiger 161 report and recommendation;

(10) cells on the final approach course;

b. changed the runway in use from Runway 22 Left;

c. offered or suggested Eastern 66 use a runway other than Runway 22 Left;

d. delayed the approach clearance for Eastern 66;

e. solicited pilot reports from Finnair 105 and N240V, the two aircraft immediately ahead of Eastern 66."

These portions of the stipulation were, of course, of great importance to Eastern's defense for the reason that they would virtually compel a finding that the Government's air controllers were clearly negligent, leaving only the question of whether their negligence was the sole proximate cause of the crash. It would hardly seem necessary to cite authority for the well–established principle that where parties agree to certain facts their stipulation is binding on the parties and to be given effect by the court. *Hackfeld & Co. v. United States*, 197 U.S. 442, 447, 25 S.Ct. 456, 457, 49 L.Ed. 826 (1904); *Stanley Works v. FTC*, 469 F.2d

498, 506 (2d Cir. 1972), *cert. denied*, 412 U.S. 928, 93 S.Ct. 2750, 37 L.Ed.2d 155 (1973); *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 665 (2d Cir. 1964); *Schlemmer v. Provident Life & Acc. Ins. Co.*, 349 F.2d 682, 684 (9th Cir. 1965); *Verkouteren v. District of Columbia*, 346 F.2d 842, 844 (D.C.Cir.1965). At no time before trial did plaintiffs ever indicate they were not adhering to their agreement. Indeed, on presentation of plaintiffs' case their counsel in the jury's presence read into the record certain facts from the stipulation, some of which had been partially denied by the Government, after instructions by the court that "they are to be received just as if you were receiving testimony and they are part of the record, and they are part of the evidence of this case." (A–II, 755).

When Eastern, at the beginning of its case, sought to read to the jury other portions of the statement of facts agreed to by plaintiffs, including the above–quoted provisions, an objection was sustained on the ground that the Government, which had in the meantime consented to a liability judgment against it and was therefore no longer a party to the liability claims, had originally denied them. In my view this ruling was clearly erroneous and highly prejudicial to Eastern.

The majority states that the ruling was somehow or other justified because (1) the Government had, before conceding liability and ceasing to be a party to the trial, disputed some of the facts, (2) the Government's subsequent admission of liability amounted to a "change in circumstances," and (3) the ruling, if error, did not affect Eastern's substantial rights because it could and did offer evidence of the controllers' responsibility. I emphatically disagree. In the first place, the Government's decision to concede its liability in lieu of remaining a party to the trial of that issue, strengthens rather than weakens the admissibility of the facts relating to liability which had been stipulated to by the remaining parties. Although the Government had partially denied some of these facts, neither the plaintiffs nor Eastern had done so, and they were the only parties to the trial of the liability issue.

As the majority apparently concedes, plaintiffs were only too happy to stipulate for trial purposes facts establishing the Government's negligence. Had the case against both the Government and Eastern gone forward and had plaintiffs succeeded in showing that the air traffic controllers failed to perform their duty of warning the Eastern pilot of the hazardous weather conditions, it would have been incumbent upon plaintiffs to show that the Government's negligence was not the sole proximate cause of the accident and that Eastern, despite the Government's negligence, was independently negligent. To permit plaintiffs to escape their stipulation simply because the Government withdrew, conceding liability, is a windfall to plaintiffs, effectively relieving them of that burden. Moreover, once plaintiffs' counsel offered a portion of the statement of facts in evidence, including two paragraphs which had been partially denied by the Government, fairness dictated that Eastern be permitted to introduce portions of the balance. See *United States v. Sommers*, 351 F.2d 354, 357 (10th Cir. 1965); *Reyes v. Marine Enterprises, Inc.*, 494 F.2d 866, 868 (1st Cir. 1974); *Stranaham v. A/S Atlantica & Tinfos Papirfabrif*, 471 F.2d 369, 372–73 (9th Cir.), *cert. denied*, 412 U.S. 906, 93 S.Ct. 2293, 36 L.Ed.2d 971 (1973); *Burstein v. United States*, 232 F.2d 19, 22–24 (8th Cir. 1956).

Nor can I accept Judge Waterman's position that admission of the stipulated facts would, "by freezing plaintiffs into their pretrial [strategy]," be unfair to them. If the plaintiffs had decided to drop their case against the Government because, after stipulating with Eastern to facts showing that the accident was caused by the Government's negligence, they upon reconsideration had concluded that they could not prove its liability, the exclusion of the stipulated facts might be understandable. But here the undisputed record is exactly the opposite: the Government consented to the entry of a judgment in favor of the plaintiffs against it adjudging it to be liable. To say, as does Judge Waterman, that "From this point forward, the plaintiffs literally had no case against the Government" ig-

nores the fact that the plaintiffs had already won their case on the issue of liability against the Government. Plaintiffs should not thereafter be permitted to disavow the stipulated facts upon which that liability was predicated.

The jury, in considering Eastern's defense that the accident was caused solely by the Government's fault, was entitled to have before it either the Government's concession of liability or the stipulated factual basis of such liability, or both. To deprive the jury of this extremely relevant fact on grounds of accommodating "the plaintiffs trial strategy" strikes me as a curious result, putting a premium on a "divide and conquer" scheme rather than promoting fairness. If the jury had been advised that all parties agreed that the Government was liable, the jury would have been in a better position to appraise Eastern's defense that the accident was solely the fault of the Government.

The majority's suggestion that since Eastern introduced evidence with respect to the Government's liability its rights were not substantially prejudiced is also unsupportable. An agreed statement of facts, unlike evidence which may or may not be credited by the jury, is binding on the parties and must be accepted by the jury as undisputed evidence, 2 Dewitt and Blackmar, Federal Jury Practice and Instructions, § 71.09 (3d ed.). Indeed, Judge Bramwell so instructed the jury with respect to stipulated facts that were admitted at the trial (see A–VI, 3252). Eastern's evidence as to the controllers' responsibility, on the other hand, might be believed or not, as the jury saw fit. Since Eastern's entire defense was based on the contention that the Government's negligence was the sole proximate cause of the disaster, Eastern was clearly prejudiced by the exclusion of the binding facts agreed to by plaintiffs.

## THE INSTRUCTIONS

(1) *Eastern's Right to Rely on Government Air Controllers' Performance of Their Duty*

In support of its defense that the controllers' negligence was the sole proximate

cause of the accident, Eastern requested the court to instruct the jury as follows with respect to the duty owed by the Government air traffic controllers to Eastern's pilot and his right to rely upon their performance of that duty:

"27. In this particular case you must consider whether or not it was reasonable or unreasonable for the pilots of Eastern Flight 66 to foresee that the air traffic controllers on the ground would fail to perform their duties in transmitting relevant and up–to–date weather information to the aircraft. If the pilots of Eastern Flight 66 could reasonably assume that the air traffic controllers would properly perform their job in transmitting all relevant and up–to–date weather information, then you must decide whether the pilots' decision to proceed with the approach was reasonable under the circumstances. If that decision was reasonable, then there is no negligence in the decision to continue the landing approach." (A–I, 317–318).

"36. It was the duty of the air traffic controllers in the Tower at Kennedy International Airport to inform themselves of dangers on or near Runway 22 Left and to communicate this information to the pilots of Eastern Airlines Flight 66 or to refuse clearance to conduct the approach and land until the area and runway was known to be clear of the danger." (A–I, 319).

"37. It was the duty of the air traffic controllers in the New York Common IFR Room and in the Tower at Kennedy International Airport to advise the pilots of Eastern Air Lines Flight 66 of all relevant and up–to–date weather information that could pertain to their approach and landing on Runway 22 Left at Kennedy International Airport." (A–I, 319).

These requested instructions were proper and in accord with both governing legal principles and the record evidence. A defendant is entitled to rely on another party performing his duty as long as the reliance is reasonable under the circumstances. See *McDonald v. Central School District No. 3,*

179 Misc. 333, 39 N.Y.S.2d 103 (Sup.Ct. 1941), *aff'd,* 264 A.D. 943, 36 N.Y.S.2d 438 (4th Dept.1942), *aff'd,* 289 N.Y. 800, 47 N.E.2d 50 (1943); *Foley v. State of New York,* 265 A.D. 682, 685, 41 N.Y.S.2d 256 (4th Dept.1943), *aff'd,* 294 N.Y. 275, 62 N.E.2d 69 (1945); *Allegheny Airlines v. United States,* 504 F.2d 104, 111 (7th Cir. 1974). And where, as here, the air controllers had a duty to warn Eastern's crew of hazardous conditions, *Yates v. United States, supra; Ingham v. Eastern Airlines, supra; DeWeese v. United States, supra; Martin v. United States, supra; Swanson v. United States, supra; Maloney v. United States, supra,* Eastern was entitled to a charge which clearly delineated the interdependent duties of the pilot and air traffic controllers, and which permitted the jury to find either that the fault lay wholly with the controllers or was shared by Eastern.

Rather than give the above–requested instructions, however, Judge Bramwell charged in relevant part as follows:

"Certain Government Regulations also provide that a pilot has the primary responsibility for the movement of his aircraft. However, before a pilot can be held legally responsible, he must be supplied with those pertinent facts that he is not in a position to know for himself. Those pertinent facts which the air traffic controllers in the New York Common IFR Room and in the tower at JFK Airport were expected to provide included current weather information. The controller's duty to warn however does not relieve the pilot of his primary duty and responsibility. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes, ears and instruments. A pilot cannot ignore the weather information he has obtained or disregard the weather conditions he sees around him."

That instruction simply does not permit the jury to find that the pilot was reasonably entitled under the circumstances to rely on the air controllers' performing their duty of furnishing essential information and that their negligence in failing to perform that

duty was the sole and exclusive proximate cause of the accident. It suggests instead that the pilot, regardless of any negligence on the part of the air controllers, *must* be held primarily responsible. That was clear error, not cured by Eastern's contrary argument to the jury which obviously cannot take the place of instructions to which Eastern was entitled.

### (2) *Res Ipsa Loquitur*

Judge Bramwell, erroneously in my view, instructed the jury that it might apply the doctrine of *res ipsa loquitur* to find Eastern liable, advising it that it might infer from the very occurrence of the crash that it was occasioned by some negligence on the part of the crew provided the crew had exclusive control of the aircraft and that the accident would not have happened in the ordinary course of events "if reasonable care had been exercised." This instruction was quite inappropriate in the undisputed circumstances of this case.

Where an airplane crash occurs without any explanation, a *res ipsa loquitur* charge may be appropriate. See, e. g., *Abbott v. Page Airways Inc.*, 23 N.Y.2d 502, 245 N.E.2d 388, 297 N.Y.S.2d 713 (1969). But where, as here, it is undisputed that the crash was caused by violent air turbulence and wind shear, and the claim is that the carrier should have known of the condition and avoided it, the *res ipsa* doctrine has no place and simply does not apply, since it would require the jury to hold the carrier absolutely liable, regardless of its exercise of the utmost of due care. See *Kelly v. American Airlines*, 508 F.2d 1379 (5th Cir. 1975); *Gafford v. Trans–Texas Airways*, 299 F.2d 60 (6th Cir. 1962).[1] We cannot say, in other words, that the accident would not have occurred in the ordinary course of events without negligence by Eastern.

Nor is it clear that Eastern had "exclusive control" of the airplane for purposes of the *res ipsa* charge. The exclusive control requirement insured that the defendant will be responsible for any negligence connected with the accident. Since Eastern's defense is that the negligence of the air controllers in breaching their duty of care to Eastern was the sole proximate cause of the accident, the jury simply cannot infer automatically that the crash was caused by *Eastern's* negligence as opposed to the Government's. See *Colditz v. Eastern Airlines, Inc.*, 329 F.Supp. 691 (S.D.N.Y.1971). In short, had the pilot received all of the pertinent weather reports, the plane may not have crashed.

The majority contends that the fact that other crews landed safely during the storm permits an inference the accident would not have occurred had Eastern acted with due care. An equally permissible inference, however, would be that the accident was attributable not to Eastern's negligence but to other factors, such as the wind shear or the Government's negligence. Here, where there were so many plausible explanations for the crash, the *res ipsa* charge was inappropriate and highly prejudicial to Eastern.

### (3) *Federal Regulations*

The trial court scattered about like buckshot a number of Federal Aviation Regulations, 14 C.F.R. Parts 91 and 121, many of which were wholly inapplicable to the facts of this case, and instructed the jury that non–compliance with these regulations could be considered some evidence of negligence. For instance, F.A.R. 121.133 requires that each carrier prepare and maintain a flight manual for the use and guidance of its personnel and F.A.R. 121.135 requires that the manual contain "instructions and information necessary to allow the personnel concerned to perform their duties and responsibilities with a high de-

---

1. *Citrola v. Eastern Airlines, Inc.*, 264 F.2d 815 (2d Cir. 1959), is distinguishable. There, as distinguished from here, it was not known what caused the airplane crash. The court merely held that in such circumstances the plaintiff should not forfeit his right to a *res ipsa loquitur* instruction by offering evidence of pos-

sible causes. Here, in contrast, all parties agree that the crash was caused by turbulence and wind shear. The question here was whether Eastern under the circumstances was guilty of negligence in attempting to land rather than to abandon the attempt or execute a missed approach.

gree of safety." Since there is nothing in the record to suggest that Eastern had failed to prepare a manual or that its manual was inadequate in this or any other respect, the instruction was irrelevant. Nor can the inclusion of that regulation be deemed harmless. It suggests, by reference to a "high degree of safety," that Eastern may be held to a higher standard than the governing standard of reasonable care.

Similarly, F.A.R. 121.533 places joint responsibility on the pilot and the carrier's aircraft dispatcher for preflight planning, places responsibility on the dispatcher to monitor the flight after take off until it lands, and puts the pilot in command during flight time while F.A.R. 121.601(b) imposes on the dispatcher a duty to inform the pilot of meteorological conditions during the flight. The error in including these regulations in the charge is that there was little or no evidence that Eastern's aircraft dispatcher, who was located in Miami, failed to perform his duty. Once Eastern 66, pursuant to instruction from the Government air controllers, proceeded to approach JFK on an instrument flight rules flight plan it became subject to the control and jurisdiction of the Government's air traffic control service. Nor was there any evidence to suggest that Eastern had violated either F.A.R. 91.5 which requires each pilot to familiarize himself with all available weather information prior to commencing flight or F.A.R. 121.101(a), which requires each carrier to provide adequate weather reporting facilities along the route.

The district court also erroneously submitted to the jury F.A.R. 91.3(a), which states that the pilot has direct responsibility for and final authority with respect to the aircraft. It is undisputed that Eastern did not violate, and could not have violated, this regulation. Yet the court instructed that if Eastern failed to comply with this regulation its non–compliance might be considered evidence of negligence. For much the same reason the instruction as to F.A.R. 121.533, noted above, which simply fixes responsibility and cannot be violated, was error. Finally, in an ambiguous instruction which surely compounded the jury's existing con-

fusion, the court did not advise the jury that the Federal Aviation Regulations applied to this case but, instead, instructed the jury to determine whether any of the regulations were applicable to the facts as it found them.

In my view it was clear error to instruct the jury with respect to these regulations insofar as there was no evidence in the record showing non -compliance. Standing alone, the error might be considered harmless. But, when combined with the other more serious errors, the error just further confused the jury and denied Eastern a fair trial.

The foregoing describes some, but not all, of the errors committed in the trial of this case. In addition there were others which, standing alone, would not be sufficiently prejudicial to warrant a new trial. For instance, in his summation plaintiffs' counsel, after being expressly instructed by the court not to comment on Eastern's failure to call certain of its employees (Buttion and Biggers) as witnesses, did just that, repeatedly suggesting to the jury, despite Eastern's objections and motion for a mistrial, that the failure of Buttion to appear personally in lieu of having his deposition read indicated that he either would be unwilling to testify or would be disbelieved.

This outrageous conduct on the part of plaintiff's counsel only adds fuel to the cumulative prejudice of the other errors committed below. The least that could have been done was to instruct the jury that in view of the fact that the witness was more than 100 miles from the courthouse, see Rule 32(a)(3)(B), F.R.Civ.P., and had testified at length on deposition, it was perfectly proper to offer his deposition testimony which was not entitled to less weight than live testimony merely because it was in deposition form, and that there was nothing improper under the circumstances in using the deposition. See *Wright Root Beer Co. of New Orleans v. Dr. Pepper Co.*, 414 F.2d 887, 889 91 (5th Cir. 1969); 8 Wright & Miller, Federal Practice and Pro-

cedure § 2143 at 458 (1970), 4A Moore's Federal Practice Par. 32.05[1] at 32--34, n.3, Devitt & Blackmar, Federal Jury Practice and Instructions § 73.02 at 616-17 (3d ed. 1977).

For all of the foregoing reasons, I would reverse and remand the case for a new trial.